[Cite as *State v. Moorer*, 2016-Ohio-7679.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27685 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DEQUANTE D. MOORER | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2014 09 2863 |

DECISION AND JOURNAL ENTRY

Dated: November 9, 2016

CARR, Presiding Judge.

{¶1} Appellant, DeQuante Moorer, appeals his convictions by the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Jerome Bable was shot while he sat in the backseat of a vehicle parked in a residential neighborhood in Akron. The bullet passed through his aorta, resulting in massive internal bleeding that proved fatal. Soon after the shooting, witnesses connected Moorer with the street name "Baby Te" and placed him at the scene of the crime. Moorer was charged with murder in violation of R.C. 2903.02(A), accompanied by a firearm specification pursuant to R.C. 2941.145.

{¶3} During the jury trial, the State requested that the trial court declare several individuals to be hostile witnesses, arguing that since the State's last contact with the witnesses, the substance of their testimony had changed and that at trial, they claimed for the first time to be

unable to recall the events surrounding the murder with clarity because they were under the influence of marijuana. The trial court granted the motions, permitted the State to conduct cross-examination, and allowed the admission of contradictory statements made to police during videotaped interviews.

{¶4} The jury found Moorer guilty, and the trial court sentenced him to consecutive sentences totaling 18 years to life in prison. Moorer filed this appeal. His assignments of error are rearranged for ease of discussion.

## II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING TESTIMONY OF AN ALLEGED TELEPHONE CONVERSATION BETWEEN [MOORER] AND THE DECEDENT'S MOTHER.

{¶5} Moorer's first assignment of error is that the trial court abused its discretion by permitting Mr. Bable's mother to testify about the substance of a telephone call that she received shortly after the murder. Specifically, Moorer has argued that the contents of the telephone call were not properly authenticated under Evid.R. 901(B)(6). We disagree.

{¶6} Evid.R. 901(A) provides that "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The threshold for demonstrating authentication is low, and a proponent need only offer evidence demonstrating a reasonable likelihood that the evidence is authentic. *State v. Hoffmeyer*, 9th Dist. Summit No. 27065, 2014-Ohio-3578, ¶ 18. We review a trial court's determination of authentication for an abuse of discretion. *State v. Spy*, 9th Dist. Summit No. 27450, 2016-Ohio-2821, ¶ 14.

{¶7} This Court has reservations regarding whether the authentication requirements of Evid.R. 901 should apply not only to documents and other tangible exhibits, but to the content of witness testimony as well. *Compare* Evid.R. 601, 602, and 603 (describing the threshold requirements of competency, personal knowledge, and oath or affirmation with respect to witness testimony). Nonetheless, we acknowledge that we have used this approach on one occasion and note that several other courts of appeals have adopted it as well. *See State v. Santurri*, 9th Dist. Lorain No. 98CA007262, 2000 WL 763326, *2-3 (June 14, 2000). *See also State v. Small*, 10th Dist. Franklin No. 06AP-1110, 2007-Ohio-6771, ¶ 38-42; *State v. Marcum*, 7th Dist. Columbiana No. 04 CO 66, 2006-Ohio-7068, ¶ 23-38; *State v. Earle*, 120 Ohio App.3d 457, 469 (11th Dist.1997); *State v. Wheeler*, 2d Dist. Montgomery No. 12290, 1993 WL 265133, *2 (July 16, 1993). For purposes of this opinion, therefore, we assume, without deciding, that witness testimony regarding a phone conversation in which the witness participated falls within the purview of Evid.R. 901.

{¶8} Evid.R. 901(B) provides a list of illustrations that describe, without limiting, some ways in which evidence may be authenticated as required by Evid.R. 901(A). With respect to telephone calls, Evid.R. 901(B)(6) provides that telephone calls made to a person may be authenticated "by evidence that a call was made to the number assigned at the time by the telephone company to a particular person * * * if * * * circumstances, including self-identification, show the person answering to be the one called[.]" By its terms, this illustration relates to outgoing telephone calls, so it does not apply in this case. *See State v. Thomas*, 4th Dist. Highland No. 719, 1990 WL 54913, * 4 (Apr. 17, 1990), citing Giannelli, Ohio Evidence (1982), 7, Section 901.07. Similarly, Evid.R. 901(B)(5) applies when a witness identifies a voice, "whether heard firsthand or through mechanical or electronic transmission or recording,

by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker[,]" and is inapplicable in this case.

{¶9} Turning to the general rule provided by Evid.R. 901(A), we conclude that the trial court did not abuse its discretion because there is adequate evidence to support the conclusion that the witness's testimony is what the State purports it to be: a call received on a phone frequently used by the victim from someone who identified himself as "Te." The witness testified that she had a cellular phone with her at the police department on the evening that her son died, but that her son ordinarily carried the phone. She recalled that the phone rang while she was at the police department, and the caller, who sounded "[k]ind of excited like," said her son's name repeatedly. She testified that the caller then identified himself as "Te" and, when she said, "F'ing Baby Te?" the caller hung up. The witness, therefore, made a connection between the caller and "Baby Te," but she did not identify Moorer as the caller, nor did she make a connection between him and the name "Baby Te." Consequently, the testimony and the circumstances surrounding the telephone conversation adequately demonstrate that it was what the State purported it to be: a call received from someone who identified himself as "Te."

{¶10} Moorer's first assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR BY ADMITTING INTO EVIDENCE STATE'S EXHIBIT 28, AN UNAUTHENTICATED INSTAGRAM PHOTOGRAPH.

{¶11} Moorer's fourth assignment of error is that the trial court erred by admitting a photograph obtained from Instagram when it had not been authenticated under Evid.R. 901. Moorer has acknowledged that he did not object to the authenticity of the photograph at trial and has noted that "this Court is permitted to recognize it as plain error." Moorer has not constructed

a plain error argument, however, and we decline to construct one on his behalf. *State v. Roy*, 9th Dist. Lorain No. 13CA010404, 2014-Ohio-5186, ¶ 68.

{¶12} Moorer's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION BY DECLARING [G.L.] A HOSTILE WITNESS.

{¶13} Moorer's second assignment of error argues that the trial court erred by declaring the man who was with Mr. Bable before the murder, G.L., to be a hostile witness. We disagree.

{¶14} A hostile witness is one that "demonstrates hostility during his examination by changing his testimony significantly from that which counsel had good reason to expect." *State v. Stearns*, 7 Ohio App.3d 11, 14 (8th Dist.1982). A hostile witness can be impeached in accordance with Evid.R. 607, which provides that "the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Surprise may be demonstrated "if the testimony is materially inconsistent with the prior written or oral statements and counsel did not have reason to believe that the witness would recant when called to testify." *State v. Holmes*, 30 Ohio St.3d 20, 23 (1987), citing *State v. Duffy*, 134 Ohio St. 16 (1938). Affirmative damage exists when the witness's testimony contradicts, denies, or harms the trial position of the party who called the witness. *State v. McKelton*, Slip Opinion No. 2016-Ohio-5735, ¶ 121, quoting *State v. Blair*, 34 Ohio App.3d 6, 9 (8th Dist.1986). When a trial court determines that a witness is hostile, we review that decision for an abuse of discretion. *Ramage v. Cent. Ohio Emergency Servs., Inc.*, 64 Ohio St.3d 97, 111 (1992).

{¶15} In this case, the State informed the trial court that counsel had met with G.L. the week before trial to go page-by-page through the statement that he gave to police. Counsel

stated that during that meeting, G.L. confirmed the statements made in that document. At trial, G.L. immediately refused to testify and asserted a Fifth Amendment privilege. The trial court determined that the privilege did not apply and ordered him to testify. When the trial court heard argument regarding the privilege, however, G.L.'s attorney informed the State that his testimony would not be consistent with his statement to police and that G.L. claimed to have memory problems resulting from substance use on the night of the murder.

{¶16} The record demonstrates surprise with respect to G.L.'s testimony. He had provided a previous statement to the police and had reviewed that statement with the State in close proximity to trial. During that interview, G.L. indicated that his earlier statements to the police were accurate. He did not profess that his memory of the events was impaired by substance use or mention that his statements to the police could have been inaccurate as a result of substance abuse on the night of the murder. At trial, however, G.L. changed course and informed the trial court that he could not accurately remember the events because of drug use. These are material inconsistencies, and the record supports the conclusion that the State had no reason to know that the substance of his testimony had changed when he was called to testify at trial.

{¶17} The record demonstrates affirmative damage as well. The State's trial strategy was twofold: to connect the individual known as Baby Te to the murder by placing him at the scene and to establish that Moorer is the person known as Baby Te. G.L. had previously selected Moorer from a photo array with 60-70% certainty. At trial, he recanted his previous statement, claiming impaired memory. This unanticipated trial testimony, therefore, undermined the State's trial strategy.

**{¶18}** Under these circumstances, the trial court did not err by determining that G.L. was a hostile witness, and Evid.R. 607 permitted the State to impeach his testimony with prior inconsistent statements. Moorer's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITED REVERSIBLE ERROR BY ADMITTING VIDEO RECORDINGS USED TO IMPEACH TWO OF THE STATE'S WITNESSES INTO EVIDENCE.

**{¶19}** Moorer's third assignment of error argues that the trial court erred by permitting the State to impeach G.L. and another witness, D.B., with prior inconsistent statements contained in video recordings of their interviews with police.

**{¶20}** In general, prior inconsistent statements are hearsay evidence and can only be admitted for purposes of impeachment. *McKelton*, Slip Opinion No. 2016-Ohio-5735, at ¶ 128. Evid.R. 613(B) provides that extrinsic evidence of prior inconsistent statements are admissible when the subject of the prior statement is a fact of consequence to the determination of the action provided that the statement is offered solely for impeachment, the witness is offered a prior opportunity to explain or deny the statement, and the opposing party is able to question the witness regarding the statement. "Evid.R. 613 specifically contemplates the admission of extrinsic evidence of a prior statement" under these circumstances, and "Ohio courts have regularly applied the rule to admit a witness's prior inconsistent statement for impeachment purposes." *McKelton*, Slip Opinion No. 2016-Ohio-5735, at ¶ 125.

**{¶21}** Moorer does not dispute that the requirements of Evid.R. 613(B) were satisfied in this case. In fact, his argument does not mention Evid.R. 613(B) at all. Under these circumstances, we cannot conclude that the trial court abused its discretion by admitting the prior statements at issue. *McKelton* at ¶ 126.

{¶22} The trial court did not abuse its discretion by determining that G.L. was a hostile witness or by admitting prior inconsistent statements by G.L. and D.B. Moorer's third assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FOUND [MR.] MOORER GUILTY OF MURDER BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT SUCH A FINDING.

{¶23} Moorer's fifth assignment of error is that his conviction for murder is based on insufficient evidence. Specifically, Moorer has argued that the State presented insufficient evidence that he is the individual who shot Jerome Bable. We disagree.

{¶24} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009–Ohio–6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). In reviewing the evidence, we do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The State's evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. *Id*. The identity of a perpetrator must be proved by the State beyond a reasonable doubt. *State v. Flynn*, 9th Dist. Medina No. 06CA0096-M, 2007-Ohio-6210, ¶ 12. Like any other element of an offense, identity may be established through direct or circumstantial evidence. *Id*., citing *State v. Gorgan*, 9th Dist. Medina No. 1824, 1990 WL 1771, *1 (Jan. 10, 1990).

{¶25} R.C. 2903.02(A), which prohibits murder, provides that "[n]o person shall purposely cause the death of another[.]" For purposes of R.C. 2903.02(A), a person acts purposely "when it is his specific intention to cause a certain result * * * ." *State v. Thomas*, 40 Ohio St.3d 213, 217 (1988), quoting R.C. 2901.22(A).

{¶26} Jerome Bable died as a result of a single gunshot wound from a bullet that entered his left shoulder, traveled across his left upper lung, aorta, and lower lobe of his right lung, and exited under his right arm. The coroner testified that she could not determine the distance from which the shot was fired and noted that the wound resulted in a rapid loss of blood. Detective John Ross described the progress of the investigation into Mr. Bable's death. He testified that when he arrived at the scene, he instructed officers to speak to the residents who lived at the address of the shooting. Although they were initially uncooperative, one of the residents allowed him to speak to the people in the house and suggested that he interview her children at the police station. During the course of those interviews, he learned that a person who used the street name "Baby Te" might have been involved in the shooting. Detective Ross testified that once he obtained the street name, he asked all of the witnesses if they knew who Baby Te was. In response, one of Mr. Bable's family members provided Detective Ross with a photograph from Instagram that depicted him. Using this information, Detective Ross obtained Moorer's name and generated a photo array that included his picture.

{¶27} A neighborhood resident testified that he stepped outside his house when he heard arguing. He recalled that when he looked down the street, he saw a "real skinny" black male shoot a firearm into the backseat of a maroon car parked in a driveway. He saw the maroon car back out of the driveway and drive away, followed by a gold or silver Chevrolet Malibu driven by the shooter. According to the neighbor, the area was adequately lit by a streetlight. When he

viewed a photo array after the shooting, he identified the photograph of Moorer, which was marked as photograph number four, as "maybe."

{¶28} G.L. testified that he drove Mr. Bable to the Jason Avenue area to meet a girl. He recalled that because Mr. Bable was intoxicated, he did not know whether the directions that he provided were accurate. Consequently, when he pulled the car into a driveway on Jason Avenue, he did not know where they were or whether there was really a woman at the location that Mr. Bable wanted to see. G.L. testified that while Mr. Bable made a phone call, a man opened his car door, pointed a gun at him, and demanded money. G.L. didn't have any, and the gunman opened the back door and demanded money from Mr. Bable. G.L. testified that he heard the sounds of a struggle, then gunfire. He recalled that he immediately climbed out the passenger side door and ran away, but returned within minutes to check on Mr. Bable.

{¶29} G.L. testified that he knows of a person who goes by the moniker "Baby Te," but insisted that there is more than one person associated with that name. He denied that he saw the shooter's face, but recalled that he was wearing a grey hoody with black on the hood. When G.L. viewed the photo array, he identified Moorer with 60-70% certainty.

{¶30} At the time of the shooting, D.B. lived on Jason Avenue with his parents and his siblings. He was home on the evening of the murder and testified that he heard a gunshot and looked out the window, but he denied that he witnessed anything. On the other hand, he testified that he remembered telling the police that on the night of the murder, Baby Te wore a hoody that was "grey along the front with a black hood" and black jogging pants. D.B. testified that he does not know Baby Te, but that Baby Te is his sister's boyfriend. D.B. recalled that he identified Baby Te with 100% certainty as the individual depicted in photograph number four in the photo array. He also agreed that Moorer is the person that he previously identified as Baby Te.

{¶31} The jury could reasonably conclude, based on this evidence, that the individual associated with the name Baby Te is the person who shot Jerome Bable and that Moorer is known as Baby Te. Accordingly, there is sufficient evidence supporting Moorer's conviction, and his fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

[MR.] MOORER'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, MERITING REVERSAL.

{¶32} Moorer's final assignment of error is that his conviction for murder is against the manifest weight of the evidence. We disagree.

{¶33} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶34} Moorer has argued that his conviction is against the manifest weight of the evidence because the witnesses did not present credible and consistent accounts of the events, no one identified Moorer with certainty as the shooter, the State did not present any physical evidence to corroborate its case, and, according to Moorer, one witness was himself a potential suspect. With respect to the credibility of the State's witnesses, it is clear from the record that many changed their version of events in close proximity to the trial and that few testified

willingly. It is equally apparent, however, that despite their reluctance to testify and their vacillating recollections, certain things were established as a result of their testimony.

{¶35} Although the neighbor acknowledged that it was dark at the time of the murder, he also testified that the area around the shooting was adequately lighted by a streetlight near the end of the driveway and a nearby floodlight. Detective Ross made similar observations. The neighbor identified the shooter as a "real skinny" black male, a description that Moorer maintains could also apply to D.B., casting further doubt on the substance of his testimony. In that respect, we note that evidence at trial undermined this supposition. The neighbor also testified that although he told police that D.B. or his brother matched the description, he did not see the shooter return after driving away. By the neighbor's estimation, the police arrived within five minutes of his 911 call, and it was not possible that the shooter could have returned before the police knocked at the door of D.B.'s residence. D.B. testified that he and his brother were in their house when the shot was fired and that neither left. Officer Mark Northup confirmed that the D.B.'s residence was secured from the time he arrived on scene, and he testified that he did not see men coming or going.

{¶36} Moorer also points to G.L.'s uncertainty regarding his identification of the shooter from a photo array. The trial court declared G.L. to be a hostile witness, and during the State's cross-examination, G.L. maintained that he was "high and drunk" when he reviewed the photo array and did not remember signing it. When he reviewed the photo array, G.L. refused to identify his own signature and claimed that he "just picked anybody." Nonetheless, he stated that it "might be correct" that he indicated with a 60-70% degree of certainty that Moorer's photograph depicted the shooter. G.L. is also not the only witness to identify Moorer from the

photo array: the neighbor selected Moorer's photograph as a "maybe," and D.B. identified Moorer with 100% certainty as the person known as Baby Te.

**{¶37}** According to Moorer, the witnesses' testimony is also unreliable because they differed in their recollection of the clothing worn by the shooter. Specifically, he has pointed to Detective Ross's testimony regarding early interviews of witnesses, characterizing it as testimony that Detective Ross "learned from other witnesses that the assailant was *not* wearing a hoody at the time of the shooting." (Emphasis in original.) The substance of Detective Ross's testimony, however, is different. Instead of stating that witnesses claimed the shooter was not wearing a hoody, Detective Ross testified that he had learned that "the shooter did not have a hoody over his head at the time of the shooting." In that respect, the testimony of G.L. and D.B. was consistent. G.L. placed the shooter in a grey and black hoody, while D.B. described Baby Te's clothing in the same manner.

**{¶38}** Finally, Moorer has argued that his conviction should be reversed because it is not supported by any physical evidence linking him to the crime. The absence of physical evidence does not necessarily lead to the conclusion that a conviction is against the manifest weight of the evidence. *See State v. Thomas*, 9th Dist. Summit No. 27580, 2015-Ohio-5247, ¶ 31. In addition, to the extent that Moorer's conviction is based on circumstantial evidence, that evidence does not differ from direct evidence with respect to probative value. *State v. Gibson*, 9th Dist. Summit No. 23881, 2008-Ohio-410, ¶ 8.

**{¶39}** Having reviewed all of the testimony at trial and considered the credibility of all of the witnesses, therefore, we cannot conclude that this is the exceptional case in which the evidence at trial weighs heavily against the conviction. Moorer's sixth assignment of error is overruled.

III.

**{¶40}** Moorer's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

MOORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

KRISTEN KOWALSKI, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.