[Cite as *State v. Yuschak*, 2016-Ohio-8507.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

| STATE OF OHIO | | C.A. No. 15CA0055-M |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| TERRY M. YUSCHAK | | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | | CASE No. 14-CR-0208 |

DECISION AND JOURNAL ENTRY

Dated: December 30, 2016

---

MOORE, Judge.

{¶1} The Defendant, Terry Yuschak, appeals from the judgment of the Medina County Court of Common Pleas. This Court affirms.

I.

{¶2} In 2014, Mr. Yuschak arranged for his girlfriend's cousin, Mason Braun, to obtain drugs from Mr. Yuschak's daughter, Taryn Yuschak, in an attempt to arrange for a police bust of the drug deal so that Taryn could be arrested and treated for her drug addiction. After Mason contacted Taryn seeking drugs, Taryn contacted a man with whom she had gone to school, Martez Hope, to help her obtain the drugs. Mr. Hope agreed to drive Taryn to Cleveland, and advanced her money, to purchase heroin. Mr. Hope then drove Taryn to a Dairy Queen parking lot where she had arranged to meet Mason to complete the drug transaction. Mason arrived with Mr. Yuschak at the Dairy Queen. After they arrived, Mr. Hope was shot. As a result of the shooting, Mr. Hope suffered severe injuries and complications.

{¶3} The Medina County Grand Jury indicted Mr. Yuschak on the following charges stemming from the shooting of Mr. Hope: one count of attempted murder in violation of R.C. 2923.02(A) and R.C. 2903.02(A), one count of felonious assault in violation of R.C. 2903.11(A)(1), and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), together with firearm specifications attendant to the attempted murder and felonious assault charges. Mr. Yuschak pleaded not guilty to the charges, and the case proceeded to a jury trial. Following the trial, the jury found Mr. Yuschak guilty of all charges. The trial court sentenced Mr. Yuschak to an aggregate term of incarceration of ten years, and it imposed a $15,000 fine.

{¶4} Mr. Yuschak timely appealed from the sentencing entry, and he now presents five assignments of error for our review. We have re-ordered the assignments of error to facilitate our discussion.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S DENIAL OF MR. YUSCHAK'S PEREMPTORY
CHALLENGE WAS A SUBSTANTIVE VIOLATION OF HIS RIGHT TO A
FAIR AND IMPARTIAL JURY[.]

{¶5} In his first assignment of error, Mr. Yuschak argues that the trial court erred by denying his peremptory challenge of a venireperson based upon the State's *Batson* challenge. We disagree.

{¶6} "In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the [S]tate in the exercise of its peremptory challenges so as to exclude members of minority groups from service on petit juries." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 80, citing *Batson v.*

*Kentucky*, 476 U.S. 79, 89 (1986). "A court adjudicates a *Batson* claim in three steps." *Maxwell* at ¶ 80, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 61. "First the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge." *Maxwell* at ¶ 80, citing *Batson* at 96-98. "Finally, the trial court must decide based on all the circumstances whether the opponent has proved purposeful racial discrimination." *Maxwell* at ¶ 80, citing *Batson* at 98. "This Court reviews whether a party exercised its peremptory challenges in a discriminatory manner under the clearly erroneous standard." *State v. Payne*, 9th Dist. Summit No. 26655, 2013-Ohio-5230, ¶ 19, citing *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991).

{¶7} Here, during voir dire, a potential juror identified by name as Ms. Griffin in the transcript, asked the court if the proceedings would continue past 5:00 on the days of court proceedings because she had a deadline by which she was required to pick up her daughter from daycare. The trial court responded that the goal would be to finish proceedings each day prior to 5:00. Later during voir dire, the State asked Ms. Griffin what the latest time was by which she would have to leave each day. She responded that she would need to leave by approximately 5:30. Thereafter, the defense asked Ms. Griffin if she would get "stressed" if court proceedings were nearing 5:00. She responded that she would probably be concerned, but it would not affect her ability to concentrate. Ms. Griffin's juror number is not stated in the transcript.

{¶8} When exercising its peremptory challenges, the defense indicated that it wished to exercise a peremptory challenge with respect to Juror No. 81. The following exchange then occurred:

> [The State]: Your Honor, we would challenge that one, a *Batson* challenge here, and just ask for a reason.

[Defense Counsel]: I didn't like the answer about her being nervous about her having to worry about 5 o'clock.

The Court: Well, she only needs to be out by 5 o'clock which is something within the Court's control so we will not keep her here past 5 o'clock so she will not have to worry and based on the *Batson*, I'm denying that peremptory.

[Defense Counsel]: Okay.

[The State]: Well, in this case, just for the record, there are some issues that one could think that someone from the Defense attorney, the Defense would want to exclude an African-American person so I would – I just didn't think there was any reason.

[Defense Counsel]: Okay.

The Court: You can save it for appeal.

{¶9} At the conclusion of the challenges, the record indicates that Juror No. 81 was part of the impaneled jury. Later, the State added to the record that, from the State's observations, the challenged juror was an African-American woman, and was the only African-American juror in the venire.

{¶10} We note that, although we can reasonably infer from this particular record that Juror No. 81 was the same juror referenced above that was identified as Ms. Griffin earlier during voir dire, it would be prudent for the parties to exercise diligence in clearly identifying the veniremen at issue in challenges such as this one. Matters that are obvious to persons in the courtroom at trial remain a mystery to a reviewing court unless counsel take affirmative steps to preserve the record as to the identity of persons at issue at the trial level, as the appellate court is constrained in its review to matters in the record.

{¶11} Next, in support of his argument that the trial court erred in denying his peremptory challenge, Mr. Yuschak argues that the holding of *Batson* is inapplicable to a peremptory challenge made by a defendant. However, "*Batson* has * * * been extended to defense peremptory challenges[.]" *Maxwell*, 139 Ohio St.3d 12, at ¶ 81, citing *Georgia v.*

*McCollum*, 505 U.S. 42 (1992). Therefore, to the extent that Mr. Yuschak argues that *Batson* applies only to the State's use of peremptory challenges, his first assignment of error is overruled.

{¶12} Mr. Yuschak further argues that the trial court erred in ruling in favor of the State with respect to its *Batson* challenge, because the defense provided a race neutral reason for the exercise of the peremptory challenge. However, even where a facially race neutral reason is provided, "[i]n the third step of the *Batson* analysis, the trial court must determine whether, under all the relevant circumstances, the [State] has met his burden of proving purposeful racial discrimination." *Payne*, 2013-Ohio-5230, at ¶ 22, citing *Batson* at 96-97. "The trial court must consider the persuasiveness and credibility of the justification offered by the [proponent of the peremptory challenge]." *Payne* at ¶ 22, citing *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 99 (1997), citing *Purkett v. Elem,* 514 U.S. 765, 768 (1995). "It must determine whether the neutral explanation offered by the [proponent of the peremptory challenge] is credible or is instead a pretext for unconstitutional discrimination." *Payne* at ¶ 22, citing *Hernandez* at 363. "The trial court's finding turns largely on evaluations of credibility and is given great deference." *Payne* at ¶ 22, citing *Batson* at 98, fn. 21.

{¶13} Here, the race neutral reason given for the exercise of the peremptory challenge was that Ms. Griffin was concerned about leaving by 5:00. However, during voir dire, when Ms. Griffin had inquired about this, the court indicated that it intended to end proceedings each day prior to 5:00, and Ms. Griffin indicated that she needed to leave by approximately 5:30 each day to pick up her child. She also indicated that her concern as to the time would not affect her ability to concentrate. We cannot say that the trial court clearly erred in its apparent conclusion that the race-neutral reason provided by the defense was not credible.

**{¶14}** Accordingly, Mr. Yuschak's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE ADMISSION OF UNAUTHENTICATED AND PREJUDICIAL RECORDINGS DEPRIVED MR. YUSCHAK OF A FAIR TRIAL[.]

**{¶15}** In his second assignment of error, Mr. Yuschak argues that the trial court erred in admitting into evidence a recording of a telephone conversation between Mr. Yuschak and his former girlfriend, Crystal Sigler. We disagree.

**{¶16}** Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "The threshold for demonstrating authentication is low, and a proponent need only offer evidence demonstrating a reasonable likelihood that the evidence is authentic." *State v. Moorer*, 9th Dist. Summit No. 27685, 2016-Ohio-7679, ¶ 6, citing *State v. Hoffmeyer*, 9th Dist. Summit No. 27065, 2014-Ohio-3578, ¶ 18. "We review a trial court's determination of authentication for an abuse of discretion." *Moorer* at ¶ 6, citing *State v. Spy*, 9th Dist. Summit No. 27450, 2016-Ohio-2821, ¶ 14.

**{¶17}** Evid.R. 901(B) provides a nonexhaustive list that illustrates the ways in which the proponent of the admission of evidence can conform with Evid.R. 901(A). Evid.R. 901(B)(1) provides that authentication or identification of evidence may be achieved through the testimony that "a matter is what it is claimed to be." In addition, Evid.R. 901(B)(5) provides that identification of a voice, "whether heard firsthand or through mechanical or electronic transmission or recording," can be authenticated "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

{¶18} At trial, the State called Mr. Yuschak's former girlfriend, Crystal Sigler, to testify. During her testimony, Ms. Sigler acknowledged that she had numerous telephone conversations with Mr. Yuschak while he was in jail prior to her ceasing communication with him. The State then showed Ms. Sigler a CD on which her name and that of Mr. Yuschak were written, as was a phone number that Ms. Sigler believed to have been her home phone number. The State indicated that it was going to play a portion of a recording and ask her to identify the voices. At that point, Mr. Yuschak objected on the basis that there was no evidence presented relative to the jail's recording system and on the basis that Ms. Sigler's statements on the recording amounted to hearsay. The trial court overruled the objection, and the State played the recording of one telephone call contained on the CD, marked as its Exhibit 23. After about ten seconds of playing the recording, Ms. Sigler indicated that she recognized the voices on the recording as hers and Mr. Yuschak's. After the State rested, during its request to admit the exhibits, Mr. Yuschak argued that Exhibit 23 should not be admitted because there was no authentication from anyone from the jail and the recording contained highly prejudicial and needlessly confusing facts. The trial court admitted the recording. During the jury's deliberations, it requested to hear, and was played, the recording again.

{¶19} On appeal, Mr. Yuschak appears to argue that Ms. Sigler's authentication of the recording was improper because the State elicited her identification of the voices in an unduly suggestive manner in that the State displayed to her the CD which had her name, Mr. Yuschak's name, and their home phone number written on the CD. However, the purportedly suggestive manner in which the State elicited the testimony was not the basis of the objection raised below. Accordingly, absent plain error, Mr. Yuschak has forfeited this issue on appeal. *Akron v. Stalnaker*, 9th Dist. Summit No. 23617, 2007-Ohio-6789, ¶ 13; Crim.R. 52(B). However, Mr.

Yuschak does not make a plain error argument with respect to the purported suggestiveness of the State in eliciting the testimony, and we decline to address this portion of his argument. *See Trogdon v. Beltran*, 9th Dist. Lorain No. 15CA010809, 2016-Ohio-5285, ¶ 21 (stating that this Court was not inclined to create a plain error argument where the appellant failed to argue plain error).

{¶20} Mr. Yuschak further argues that there was not proper authentication of the CD because there existed no testimony from anyone that the recording was an authentic, accurate and trustworthy copy of the original conversation. In support, Mr. Yuschak relies on *State v. Tyler*, 196 Ohio App.3d 443, 2011-Ohio-3937 (4th Dist.). There, the victim testified as to her telephone number and testified that she had received a call from the defendant when he was in jail on a certain date, and she had recognized his voice after he began to engage her in the telephone conversation, despite him having provided the name of another individual when prompted at the commencement of the call. *Id.* at ¶ 9, 14-17. In addition, a deputy testified that he retrieved a recording of the telephone conversation from the jail's recording system, based upon the date and the number that the victim had identified. *Id.* at ¶ 30. The trial court permitted the recording to be admitted into evidence. On appeal on this issue, the Fourth District expressed concern regarding the minimal effort given to authenticate the recording at trial, recognizing that neither the victim nor any other witness "expressed their opinion concerning the identity of the voices on the recording[]" admitted into evidence at trial. *Id.* at ¶ 28, 32-33. However, based upon the testimony of the victim and the deputy, the Fourth District held that there was a "minimally sufficient foundational basis for authenticating the recording[.]" *Id.* at ¶ 57. Here, Mr. Yuschak argues that the testimony presented at trial does not meet the minimally sufficient foundational basis for authenticating the jailhouse call recording.

{¶21} However, unlike *Tyler*, here, Ms. Sigler identified her voice and that of Mr. Yuschak on the recording. Accordingly, the present case is more akin to *State v. Shepherd*, 8th Dist. Cuyahoga No. 97962, 2012-Ohio-5415, where a witness identified at trial the voices of individuals on a recorded jailhouse call. *Id*. at ¶ 33, 38. On appeal, the defendant challenged the admissibility of the recording, arguing that "the [S]tate should have also submitted testimony of an employee of the county jail to establish how and when these recordings were made[.]" (Internal quotations omitted.) *Id.* at ¶ 39. The Eighth District found this argument unpersuasive because, as stated above, Evid.R. 901(B) permits that a voice on a recorded conversation can be identified by someone who is familiar with the voice. *Id.* Likewise, here, Ms. Sigler testified that she was familiar with her voice and that of Mr. Yuschak, and she identified the voices on the recorded jailhouse call. *See* Evid.R. 901(B)(5).

{¶22} Accordingly, Mr. Yuschak's second assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

MR. YUSCHAK'S CONVICTIONS WERE AGAINST THE WEIGHT OF THE EVIDENCE[.]

{¶23} In his fourth assignment of error, Mr. Yuschak argues that his convictions were against the manifest weight of the evidence. We disagree.

{¶24} When a defendant asserts that his conviction is against the manifest weight of the evidence:

an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶25}  Here, Mr. Yuschak was charged with one count of attempted murder in violation of R.C. 2923.02(A) and R.C. 2903.02(A), one count of felonious assault in violation of R.C. 2903.11(A)(1), and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), together with firearm specifications attendant to the attempted murder and felonious assault charges.  R.C. 2923.02(A) provides that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."  R.C. 2903.02(A) defines the offense of murder, and provides in relevant part that "[n]o person shall purposely cause the death of another * * *."  "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."  Former R.C. 2901.22.

{¶26}  With respect to felonious assault, R.C. 2903.11(A)(1) provides, in relevant part, that "[n]o person shall knowingly * * * [c]ause serious physical harm to another[.]"  In regard to having weapons while under disability, R.C. 2923.13(A)(2) provides, in relevant part, that "[u]nless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence[.]"

{¶27}  The gun specifications attendant to the attempted murder and felonious assault charges, alleged that Mr. Yuschak had a firearm on or about his person or under his control while committing the offenses and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offenses.  *See* R.C. 2941.145.

{¶28} The jury found Mr. Yuschak guilty of all of the charges and specifications. On appeal, Mr. Yuschak argues that his convictions are against the weight of the evidence because the evidence did not demonstrate that Mr. Yuschak shot Mr. Hope or that he intended to cause Mr. Hope's death.

{¶29} At trial, the State presented the testimony of several individuals, including: Mr. Hope, Ms. Sigler, Dawn Kitts, Kimberly Braun, Jacqueline Senk, police officers, and employees of the Ohio Bureau of Criminal Identification ("BCI"). Mr. Hope testified that, on the date at issue, he was twenty-two years old, attended technical school, worked as a pizza delivery driver, and also made money by selling marijuana, and he occasionally sold heroin. Mr. Hope acknowledged that, when he was eighteen years old, he had been convicted for trafficking in marijuana. Around the same time, he was also convicted of third-degree felony robbery for stealing marijuana. On March 20, 2014, he had been communicating on Facebook with Taryn, with whom who he had gone to high school, and whom he believed to be a heroin user. Taryn asked him if he could take her to Cleveland to get drugs. Taryn told him that her friend Mason wanted "300" and she asked if he had extra money to get that, and he said he did. He provided this money to purchase the heroin so that he could earn a profit on it. Mr. Hope drove Taryn to Cleveland, where she obtained heroin for $150 or $200, and they then traveled to Medina. On their way there, Taryn, who had been texting with Mason, told Mr. Hope that they were going to meet Mason at Dairy Queen on Route 18 in Medina. Mr. Hope pulled into a hotel parking lot to watch the Dairy Queen to make sure they were not headed into a bad situation or a setup.

{¶30} After some time had passed, Mr. Hope and Taryn pulled into the Dairy Queen. Mr. Hope told Taryn to tell Mason that they were in the silver car and to just get in when he got there. While parked at the Dairy Queen, Mr. Hope saw a red pickup truck pull quickly into the

parking lot. In the passenger seat of the truck, Mr. Hope saw "a young kid" whom he had never seen before. Taryn looked back and said "Oh, my God, that's my dad. We got to go." Mr. Hope put his car in reverse and began to slowly pull out. As he was doing that, he looked over at the truck again, and saw "this guy jumping out with a pistol in his hand, a revolver" from the driver's side. The person with the gun was much older than the passenger. The man with the gun ran toward the car and aimed the pistol at Mr. Hope, who put his arms up to try to protect himself. At that point, Mr. Hope recalled that his window exploded, and he felt his arm burning and felt something moving through his stomach. He floored his car backwards and crashed into the Dairy Queen building. Mr. Hope grabbed his stuff from the car and ran to a nearby hotel, holding his side and screaming for help. A few minutes later the police arrived. A police officer asked who had done this to him, and he said it was Taryn's dad. Mr. Hope testified that he had told the police that Taryn's dad had shot him because Taryn had said it was her dad that was pulling into the Dairy Queen. Mr. Hope recalled that the shooter was wearing a baseball cap, jacket and blue jeans. Mr. Hope indicated that he was sure the shooter had a hat on, and he was sure that he came from the driver's side of the truck and that he was the much older person of the two men in the truck.

{¶31} When asked at trial if Mr. Hope saw the person who shot him in the courtroom, he responded that he did, and he stated that the person was wearing a nice black suit, purple shirt, and was shaved up a bit. However, there was no request for the record to reflect that Mr. Hope had identified the defendant.

{¶32} Mr. Hope further testified that, after police arrived at the scene, he was air lifted by helicopter to the hospital, where he spent more than five months, having over ten surgeries. During these procedures, he also obtained an infection, causing him to lose muscles from his

legs, and, as a result, he could no longer walk without assistance. Parts of his pancreas, stomach, and intestines had to be removed.

{¶33} Ms. Senk testified that, on March 20, 2014, she was employed as a medicine delivery driver. Her route took her through Medina. On the date at issue, she began her route at 6:00 p.m. at a pharmacy in Wadsworth. She then traveled along Route 18 to get to I-71, while it was still daylight. While driving in the far right lane, which was closest to the Dairy Queen, she happened to look over at the Dairy Queen, and she saw a car backing out of a parking spot. A man wearing a baseball cap and holding a silver short-barrel revolver, lunged toward the backing car and fired a shot into the driver's side window. After witnessing the shooting, Ms. Senk then pulled into the driveway of a car dealership, panicking and attempting to locate her cell phone to call 9-1-1. She found her phone, called 9-1-1, and began speaking with the 9-1-1 dispatcher, as she turned her car around and slowly pulled up the dealership driveway. While speaking with 9-1-1 from that location, a building was blocking her from seeing the Dairy Queen parking lot. However, she noticed a man running from the direction of Dairy Queen towards the dealership, and she told 9-1-1 that "[h]e's running." She lost sight of the man, but then saw him coming back, walking. That man had nothing on his head. She had believed he was the shooter at the time because she had only seen one person. When he walked back, he stopped and talked to some people looking toward the Dairy Queen area. Ms. Senk then started questioning if that was the shooter because he appeared to have a different physique and was not wearing a hat.

{¶34} On cross-examination, Ms. Senk acknowledged that there is no mention of the shooter wearing a hat in the 9-1-1 call or in her statement. The first time Ms. Senk had mentioned that the shooter was wearing a hat was to an officer that called her later on the night of the shooting.

{¶35} Ms. Sigler testified that Mr. Yuschak was her boyfriend at the time of the incident, and they lived together. A couple of days prior to March 20, 2014, Ms. Sigler's cousin, Mason, was staying with Ms. Sigler and Mr. Yuschak in their home, as he was assisting Mr. Yuschak in cutting down some trees. On March 20, 2014, Ms. Sigler overheard Mr. Yuschak asking Mason to set up Taryn to get her arrested and off of heroin. At some point on March 20, 2014, Mr. Yuschak and Mason left the house in Mr. Yuschak's red Chevy S-10. On the same day, Ms. Sigler's mother, Dawn Kitts, had come to visit Ms. Sigler at her home. After Mr. Yuschak and Mason left the home, Ms. Kitts spoke with Mr. Yuschak on the telephone.

{¶36} Ms. Kitts testified that Mr. Yuschak and Mason were chopping firewood when she arrived at the Sigler/Yuschak home on March 20, 2014. She recalled that Mason and Mr. Yuschak left the home. After they left, Ms. Kitts spoke with Mr. Yuschak on the phone. During their conversation, Mr. Yuschak was upset and angry and told Ms. Kitts that Ms. Kitts' son was with Taryn, and Mr. Yuschak was going to shoot Ms. Kitts' son in the head. Ms. Kitts then called her son to verify that he was okay and he was not with Taryn.

{¶37} Ms. Braun testified that she is Mason's mother, and she was friends with Mr. Yuschak. Prior to the incident, she had called Mr. Yuschak to see if he was familiar with a campground that was near his house. Mr. Yuschak called her back on the evening of March 20, 2014. He told Ms. Braun that he was not familiar with the campground, but he then asked her to do him a favor by calling the police and telling them there was a drug deal about to transpire. Ms. Braun thought Mr. Yuschak was joking and stated that she would jump right on that. In response, Mr. Yuschak told her to never mind, because he did not want to get her involved. When he said that, Ms. Braun asked where Mason was, and told him to put Mason on the phone.

On the phone, Mason sounded nervous. After she got off the phone with Mr. Yuschak and Mason, Ms. Braun called the police and was ultimately transferred to Officer Matthew Ventura.

{¶38} Officer Ventura of the Medina Township Police Department, testified that, on March 20, 2014, dispatch transferred to him a call from a female who said that her son was on his way to Dairy Queen for a heroin deal. The only information the woman gave him was that her son and another man were in a small red pickup truck. The officer then went to a business uphill from the Dairy Queen to monitor and survey the area, and he also contacted his supervisor, Sergeant Shari Mangel. While surveying the area, the officer noticed a small red pick-up truck in the Dairy Queen parking lot. He then heard a gunshot and saw that a silver vehicle had struck the Dairy Queen building.

{¶39} Officer Ventura further testified that after he heard the shot, he activated his overhead lights and headed in the direction of the Dairy Queen. As he pulled in, three people were getting into the red pickup truck. In court, Officer Ventura identified Mr. Yuschak as one of those three individuals, and stated that Mr. Yuschak was getting into the driver's side of the truck when the officer arrived at the scene. There were people in the parking lot directing the officer toward the hotel. Officer Ventura then noticed the truck begin to back out, and Officer Ventura told them to stop. The officer radioed other officers and told them to detain the individuals in the red truck, and the officer went to the hotel, where Mr. Hope was lying on the floor of the lobby with a gunshot wound. The officer asked his name and age, and applied pressure to his wounds. Officer Ventura asked Mr. Hope who shot him, and he said "Taryn's dad." The officer was not aware who that was at the time, but he relayed that information to other officers.

{¶40} Officer Ventura additionally testified that, when he returned to the Dairy Queen, Mr. Yuschak was seated in Sergeant Mangel's patrol car, and Officer Ventura advised him of his rights, and asked him what happened. Mr. Yuschak said that he did not know anything had happened in the parking lot, and he had heard a gunshot and that was it. The officer then spoke with Taryn and Mason. After speaking with them, the officer returned to Mr. Yuschak with other officers to perform a test for gunshot residue using a kit that involves swabbing a person's hands to determine if there exists the presence of gunshot residue from a recently fired gun. The officers told Mr. Yuschak, who was in handcuffs, what they planned to do, at which point he began to resist and scream. Mr. Yuschak began to pull away physically from the officers, fighting with them and stating "You f***ing n*****s aren't doing shit." He continued calling the officers by the racial epithet "n*****s[,]" at least ten times. Although Mr. Yuschak was repeating this racial slur, Officer Ventura testified that there were no African-American people at the scene at that point, and, during his time at the scene, he had encountered only one African-American person: Mr. Hope. Eventually, when it became more apparent that the officers were going to conduct the test regardless of Mr. Yuschak's resistance, Mr. Yuschak began to calm down. The officers also performed the test for gunshot residue on Mason, who had an agreeable demeanor.

{¶41} Later, Officer Ventura assisted in a search of the red pickup truck. In the truck, officers located a black conceal carry holster behind the driver's seat in a plastic grocery bag. During her testimony, Ms. Sigler identified the holster as one that she had seen in the nightstand of her and Mr. Yuschak's bedroom.

{¶42} Officer Ventura further testified that, on March 21, 2014, he retrieved a hat from the jail that Mr. Yuschak was wearing at the scene. Thereafter, the officer twice went to the

hospital where Mr. Hope was being treated. The first time, the officer obtained the bullet that was recovered from Mr. Hope's body, and the second time, the officer wished to speak to Mr. Hope, but he could not speak with him because he was sedated and had just had surgery.

{¶43} On cross-examination, Officer Ventura acknowledged that he never performed a gunshot residue test on Mr. Hope. He further indicated that he was one hundred percent sure that Mr. Yuschak was wearing a hat at the scene.

{¶44} Lieutenant Matthew Neil of the Montville Township Police Department testified that he was a sergeant on shift at the time of the incident. He and another auxiliary officer responded to assist at the scene upon hearing Officer Ventura's call about a hit and skip and shot fired at the Dairy Queen. As they approached, Lieutenant Neil asked Officer Ventura where he wanted them, and Officer Ventura advised Lieutenant Neil to take into custody the people who were in the red truck at Dairy Queen. When they arrived at the scene, a man, who the lieutenant identified as Mr. Yuschak at trial, was standing outside a red truck. Mr. Yuschak told Lieutenant Neil that "[h]e went that way," and pointed at the hotel. There was a young lady with Mr. Yuschak that was seated in the passenger seat of the truck, and she identified herself to the lieutenant as Mr. Yuschak's daughter. There was no one else in the truck.

{¶45} Sergeant Mangel of the Medina Township Police Department, testified that she was contacted by Officer Ventura about a phone call that he received, which had informed him that a possible drug deal that was going to occur at Dairy Queen. The sergeant was headed to the area when she learned that there had been a shooting at the Dairy Queen.

{¶46} After arriving at the scene, Sergeant Mangel spoke to Mr. Yuschak, who stated that he had just arrived there to pick up his daughter, he heard a shot, and he did not know what else happened. Sergeant Mangel put Mr. Yuschak in handcuffs and detained him in her cruiser.

Dispatch indicated that a female caller had stated that she saw a male running from Dairy Queen to a car dealership, and Sergeant Mangel then made contact with the man, later identified as Mason, who was on the sidewalk in front of a neighboring business. After speaking with Mason, Sergeant Mangel returned her attention to Mr. Yuschak, and she again asked him again what had happened. Mr. Yuschak then stated that he arrived at Dairy Queen with Mason in the red pickup truck to pick up his daughter, and he observed a male coming up from the car dealership parking lot to Dairy Queen. Mr. Yuschak maintained that this man shot at the silver car, and he then took off running back towards the car lot, got into another silver car, and drove away on the highway. However, Sergeant Mangel indicated that, at some point, Officer Ventura radioed to the officers on the scene that Mr. Hope had identified "Taryn's father" as the person who shot him.

{¶47} In addition, Sergeant Mangel testified that, based upon a discussion with Mason, she and other officers followed Mason to the back lot of the car dealership. There, with the help of firefighters who had arrived to assist in the search, they located a gun in a drainage ditch and two rounds of ammunition in the mud and tall weeds.

{¶48} On cross-examination, Sergeant Mangel indicated that she could not recall what Mr. Yuschak was wearing at the scene. Further, she opined that a gunshot going in the car would create a risk to anyone in the car.

{¶49} George Staley testified that he works for the BCI as part of the crime scene unit. Agent Staley testified that he was called to the scene to investigate the shooting. He went to the scene to document the Dairy Queen, a car dealership, and a hotel. At the dealership, a firearm was found in the back grassy area. Two unspent cartridges were located in the grass in a different area by the dealership. The gun, which could hold five cartridges, had two cartridges inside of it, one that was spent and one that was live. During her testimony, Ms. Sigler

identified the gun as one belonging to Mr. Yuschak, which he kept in their nightstand when they lived together.

{¶50} On cross-examination, Agent Staley acknowledged that, if two people were in the car that was shot at, then it could potentially pose a risk for both people in the car depending on the trajectory.

{¶51} Andrew Chappell, a forensic scientist, testified that he works in the firearm section of the BCI. With respect to this case, he received a gun, two cartridges (which he used to test fire the gun), an additional cartridge, a fired cartridge case, and a bullet recovered from Mr. Hope. Mr. Chappell tested the gun, which was operational. With respect to the bullet, Mr. Chappell found barrel and groove variations on the bullet recovered from Mr. Hope that matched the variations on the bullets recovered from his test shots of the gun. Mr. Chappell stated that these variations are unique to a particular firearm, and concluded the bullet recovered from Mr. Hope was fired from the gun submitted in this case.

{¶52} In addition to her testimony set forth above, Ms. Sigler further testified that after the shooting, in the very early morning hours, Taryn and one of Mr. Yuschak's sons came to the house, and Mr. Yuschak's son removed the guns from the bedroom shared by Ms. Sigler and Mr. Yuschak. The day after the shooting, Ms. Sigler received a call from Mr. Yuschak while he was in the jail. This recording, which was the subject of Mr. Yuschak's second assignment of error, which we addressed and overruled above, was admitted into evidence. On the recording, Mr. Yuschak claimed that the victim had his hands around Taryn's throat when Mr. Yuschak arrived, and that the victim had shot at Mr. Yuschak. During the called, Mr. Yuschak referred to the victim as a f***ing n****r, and Mr. Yuschak indicated that he hoped the victim died.

{¶53} Detective Angela Vivo of the Montville Township Police Department, testified that she assisted Medina Township Police with a search of the area between Dairy Queen and the hotel to which Mr. Hope had run after the shooting. They found no guns in that area. On April 28, 2014, Detective Vivo visited Mr. Hope in the hospital and presented him with two photo lineups to attempt to identify the driver and the passenger of the red pickup truck. Mr. Hope chose a photo from the passenger lineup, and he stated that he was ninety percent sure that the individual in the photo was the passenger. The photo he chose was not a photo of Mason, but was a photo of a random selection for the lineup. Mr. Hope chose two photos for the driver, one of which depicted Mr. Yuschak and one of which was a random selection for the lineup. Mr. Hope indicated that he was sixty percent sure that those photographs depicted the driver.

{¶54} In addition to the evidence and testimony set forth above, the parties also entered into two stipulations. First, they stipulated to the admissibility of a report from BCI indicating that gunshot residue testing of both Mr. Yuschak and Mason indicated that both men had gunshot residue on their hands. They also stipulated that Mr. Yuschak had been convicted of abduction, a felony of the third degree, in 2008.

{¶55} Based upon the evidence admitted at trial, we cannot agree that the evidence weighed against Mr. Yuschak's convictions. Although Mr. Yuschak argues that it would have been illogical for him to shoot into a car where his daughter, whom he was trying to assist, was located, other evidence weighs in favor of his convictions. Ms. Sigler indicated that the gun recovered from dealership, which the BCI personnel concluded shot the bullet recovered from Mr. Hope, belonged to Mr. Yuschak. Mr. Yuschak planned the meeting with Taryn, and he drove with Mason, who is much younger than Mr. Yuschak, to the Dairy Queen. Mr. Hope testified that there was a noticeable age difference between the driver and passenger of the red

truck, and that the man he believed to be "Taryn's dad," and not the "young kid" was the one who shot him. Further, it is undisputed that Mr. Yuschak was wearing a hat when the police arrived quickly at the scene. Ms. Senk testified that she was positive that the shooter was wearing a hat. In addition, Mr. Yuschak indicated to Ms. Kitts prior to the shooting that he intended to shoot her son, who he believed was with Taryn, in the head. He indicated in the telephone call recorded after the shooting that he hoped the victim, who he referenced with a racial epithet, died. The evidence is not disputed that Mr. Yuschak had a previous conviction which disabled him from possessing a firearm. From the evidence presented, we cannot conclude that this is the extraordinary case where the jury lost its way in determining that Mr. Yuschak had control of a gun while under disability, that he used that gun to shoot Mr. Hope, with the specific intent of causing his death, and that he ultimately caused Mr. Hope serious physical harm. Accordingly, Mr. Yuschak's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE JURY INSTRUCTION FOR COUNT ONE FAILED TO REQUIRE A FINDING OF PURPOSEFUL FOR A CONVICTION OF ATTEMPTED MURDER[.]

{¶56} In his fifth assignment of error, Mr. Yuschak argues that the trial court committed plain error in failing to instruct the jury that the offense of attempted murder requires a finding that he acted to "purposely" cause the death of another.

{¶57} Because Mr. Yuschak did not object to the instructions, he has forfeited all argument except for that of plain error. Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *State v. Gasser*, 9th Dist. Medina No. 15CA0046-M, 2016-Ohio-7538, ¶ 45. "[T]he accused bears the burden of proof to demonstrate plain error on the record * * * and must show

an error, i.e., a deviation from a legal rule that constitutes an obvious defect in the trial proceedings[.]" *Gasser* at ¶ 45, quoting *State v. Jackson*, 9th Dist. Summit No. 27479, 2015-Ohio-5096, ¶ 51, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22. "However, even if the error is obvious, it must have affected substantial rights, and [w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *Gasser* at ¶ 45, quoting *Jackson* at ¶ 51, quoting *Rogers* at ¶ 22. "The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice * * *." *Gasser* at ¶ 45, quoting *Jackson* at ¶ 51, quoting *Rogers* at ¶ 22.

**{¶58}** Here, Mr. Yuschak argues that the trial court erred by failing to instruct the jury, with respect to the charge for attempted murder, that the State was required to prove that Mr. Yuschak's purpose was to cause the death of Mr. Hope. However, in the instructions on the attempted murder charge, the trial court stated:

> It must be established in this case that at the time in question there was present in the mind of the Defendant a specific intention to engage in conduct that, if successful, would result in the death of Martez Hope and further there was in the mind of the Defendant a specific intention to cause the death of Martez Hope.
>
> * * *
>
> Attempted offense. The elements of murder are to purposely cause the death of Martez Hope.

**{¶59}** Therefore, it appears that the trial court gave the instruction that Mr. Yuschak argues should have been given, that, to find him guilty of attempted murder, the jury would need to find that Mr. Yuschak attempted to purposely or intentionally cause the death of Mr. Hope. Consequently, Mr. Yuschak has not demonstrated error, much less plain error. *See Gasser* at ¶ 47. Accordingly, Mr. Yuschak's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT'S IMPOSITION OF A FINE WAS AN ERROR AS THE COURT DID NOT CONSIDER MR. YUSCHAK'S PRESENT AND FUTURE ABILITY TO PAY OR THE COURT'S OWN DECISION THAT HE WAS INDIGENT[.]

{¶60} In his third assignment of error, Mr. Yuschak argues that the trial court erred in failing to abide by the provisions in R.C. 2929.18(B)(1) and 2929.19(B)(5), when it imposed upon him a $15,000.00 fine despite his indigency and without considering his present and future ability to pay. We disagree.

{¶61} R.C. 2929.18(B)(1) provides, in relevant part:

If an offender alleges in an affidavit filed with the court prior to sentencing that the offender is indigent and unable to pay the mandatory fine and if the court determines the offender is an indigent person and is unable to pay the mandatory fine described in this division, the court shall not impose the mandatory fine upon the offender.

R.C. 2929.19(B)(5) provides:

Before imposing a financial sanction under section 2929.18 of the Revised Code or a fine under section 2929.32 of the Revised Code, the court shall consider the offender's present and future ability to pay the amount of the sanction or fine.

{¶62} R.C. 2929.18(B)(1) is "clear and unambiguous in requiring that an affidavit of indigency must be 'filed' with the court prior to sentencing * * *." *State v. Bracy*, 9th Dist. Lorain Nos. 15CA010788, 15CA010795, 2016-Ohio-7536, ¶ 9, quoting *State v. Gipson*, 80 Ohio St.3d 626, 632 (1998). "The Ohio Supreme Court has interpreted the 'prior to sentencing' language 'to mean that the affidavit must be formally filed with the court prior to the filing of a journal entry reflecting the trial court's sentencing decision.'" *Bracy* at ¶ 9, quoting *Gipson* at 632. Generally, "the act of filing * * * includes the concept of time-stamping." *Bracy* at ¶ 9, quoting *Gipson* at 632. *But see State v. Calhoun*, 8th Dist. Cuyahoga No. 101816, 2015-Ohio-2155, ¶ 12-15, citing *Gipson* at 633, fn. 3 (discussing the possibility that an affidavit of

indigency might be filed at the sentencing hearing if accepted by the judge and filed pursuant to Civ.R. 5(E)). "A trial court's determination that a defendant is indigent for the purpose of appointing appellate counsel is distinct from a determination of a defendant's indigency regarding his ability to pay a mandatory fine." *State v. Palmison*, 9th Dist. Summit No. 20854, 2002-Ohio-2900, ¶ 25.

{¶63} Here, at the sentencing hearing, Mr. Yuschak's counsel indicated that an affidavit of indigency had been completed and requested that counsel be appointed to represent Mr. Yuschak in his appeal. Later during the sentencing hearing, the trial court addressed Mr. Yuschak and acknowledged that he had executed the affidavit of indigency, but that Mr. Yuschak had made statements regarding his assets in a presentence investigation (PSI) report. Considering those assets, the trial court imposed a fine of $15,000. Thereafter, the trial court appointed appellate counsel based upon the affidavit of indigency.

{¶64} The record does not contain an affidavit of indigency filed prior to sentencing in this case. Accordingly, Mr. Yuschak's arguments with respect to R.C. 2929.18(B)(1) lack merit. *See Bracy* at ¶ 9, and *Palmison* at ¶ 24-25. Further, the trial court considered the PSI in ordering the fine. The PSI has not been made a part of the record on appeal. "It is the appellant's responsibility to ensure that the record on appeal contains all matters necessary to allow this Court to resolve the issues on appeal." (Internal quotations and citations omitted.) *State v. Andreoli*, 9th Dist. Medina No. 15CA0075-M, 2016-Ohio-7167, ¶ 8. "This Court has consistently held that, where the appellant has failed to provide a complete record to facilitate appellate review, this Court is compelled to presume regularity in the proceedings below and affirm the trial court's judgment." (Internal quotations and citations omitted.) *Id.* "In cases such as this where the PSI is necessary to enable an appropriate review of the propriety of the

sentence, [Mr. Yuschak's] failure to ensure that the record includes the PSI requires a presumption of regularity in the sentencing proceedings." (Internal quotations and citations omitted.) *Id.*

**{¶65}** Therefore, Mr. Yuschak's third assignment of error is overruled.

III.

**{¶66}** Mr. Yuschak's assignments of error are overruled. The judgment of the trial court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, P. J.
HENSAL, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

ANDREA L. WHITAKER and WILLIAM T. WHITAKER, Attorneys at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and MATTHEW A. KERN, Assistant Prosecuting Attorney, for Appellee.