[Cite as *State v. Callender*, 2015-Ohio-4255.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 15AP-15 |
| | | (C.P.C. No. 14CR-1433) |
| Jesean Callender, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

## D E C I S I O N

### Rendered on October 13, 2015

*Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

*Todd W. Barstow*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

TYACK, J.

{¶ 1} Jesean Callender is appealing from his convictions of the charge of aggravated murder and related specifications. For the following reasons, we affirm the judgment of the Franklin County Court of Common Pleas.

{¶ 2} Callender assigns two errors for our consideration:

> I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARAN-TEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF AGGRAVATED MURDER AND MURDER AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY PERMITTING THE STATE TO INTRO-DUCE HIGHLY PREJUDICIAL EVIDENCE WITHOUT ESTABLISHING A PROPER FOUNDATION.

## I. Factual and Procedural History

{¶ 3} The basic facts are not in dispute. On January 17, 2013, a large group of students left Linden-McKinley High School at the end of the school day and walked a few blocks to a nearby McDonald's restaurant. Many of the students made this trip to observe a fight between rival gang members. The two gangs were "PTSQ" and "Squad." Callender was a member of PTSQ and went by the street name "J Dunk." The two participants in the fight were supposed to have been Demonte Walker, a/k/a Monte, and Michael Douglas, a/k/a Magic Mike. Prior to Monte's arrival, Magic Mike and Kaewaun Coleman agreed to engage in a fight. Coleman was a member of Squad. Before Monte and Magic Mike could begin, witnesses saw Callender fire a pistol several times into the crowd. Coleman was hit by those shots and died as a result. Witnesses claimed that Shyquan Washington, a/k/a Lil Mook, a member of PTSQ, had provided the firearm to Callender immediately before the shooting.

{¶ 4} Officers found a 9-millimeter handgun near McDonald's. They also found a spent shell casing from a 9-millimeter round. In December of 2012, Columbus police officers had been called to Lil Mook's residence to investigate a "shots fired" call where they collected shell casings. Subsequent testing by the Columbus Crime Laboratory confirmed that the pistol found at the scene fired all the shell casings found at Lil Mook's residence; the shell casing found at McDonald's; and the bullet recovered from Coleman's corpse.

{¶ 5} Callender was indicted on March 19, 2014 on one count of aggravated murder and one count of murder. Both counts contained a three-year firearm specification and a three-year criminal gang specification. On October 24, 2014, after a four-day trial, the jury returned verdicts of guilty as to both aggravated murder and murder and returned verdicts of guilty as to the specifications. On November 6, 2014, the trial court held a sentencing hearing and imposed a term of imprisonment of 30 years to life on Count One of aggravated murder, plus three years for the gun specification and

three years for the gang specification. The judgment entry was filed on December 11, 2014, and a notice of appeal was timely filed on January 9, 2015.

## II. Analysis of the Convictions

{¶ 6} The facts clearly demonstrate that a firearm was used to commit the crime, so a firearm specification was appropriate. "[T]he offender had a firearm on or about the offender's person or under the offender's control while committing the offense and * * * used it to facilitate the offense." R.C. 2941.145.

{¶ 7} The testimony at trial also demonstrated that the gang membership was a motivating factor in the shooting and in the confrontation between gang members, which originally was just supposed to be a fight. The gang-specification finding was also consistent with the evidence. "[T]he offender committed the felony that is an offense of violence while participating in a criminal gang." R.C. 2941.142. Callender further admitted to a corrections officer his gang membership and the point was conceded at trial. (R. 134, Tr. Vol. 2, 333; R. 135, Tr. Vol. 3, 448.)

{¶ 8} Murder requires a finding that the accused purposely caused the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree. R.C. 2903.02(B). Aggravated murder is distinguished by a requirement that the accused acted with prior calculation and design. "No person shall purposely, and with prior calculation and design, cause the death of another." R.C. 2903.01(A).

{¶ 9} The facts set forth clearly show that Callender was correctly convicted of murder. Callender shot at Coleman and killed him.

{¶ 10} The facts are less clear as to prior calculation and design. The firearm was given to Callender by another member of PTSQ, a/k/a Lil Mook, almost immediately before Callender started shooting. The facts do not inform us if Callender planned to get the firearm from a fellow gang member to shoot Coleman and knew the gun would be available. The jury felt that sufficient evidence was presented that the shooting was planned in advance, consistent with Callender going from the high school with other gang members to a place where a gang confrontation was about to take place. Callender was with a gang member he knew was armed. Multiple witnesses testified that Lil Mook

showed the crowd that he had a gun.  Callender got the gun and began shooting at a member of a rival gang.

### III. The Manifest Weight of the Evidence Supports the Verdict

{¶ 11} The first assignment of error is divided into two arguments: first, that the verdict was not supported by sufficient evidence; and second, that the convictions were against the manifest weight of the evidence.

{¶ 12} Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict.  *Id.*  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979).  The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact.  *Jenks* at 273.  If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant.  *See Thompkins* at 387.

{¶ 13} Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence.  *Id.* at 387.  In so doing, the court of appeals sits as a " 'thirteenth juror' " and, after " 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "  *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983); *see also Columbus v. Henry*, 105 Ohio App.3d 545, 547-48 (10th Dist.1995).  Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' "  *Thompkins* at 387, quoting *Martin* at 175.

{¶ 14} As this court has previously stated, "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly, *see* [*State v.*] *DeHass* [10 Ohio

St.2d 230 (1967)], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Nivens*, 10th Dist. No. 95APA09-1236 (May 28, 1996). It was within the province of the jury to make the credibility decisions in this case. *See State v. Lakes*, 120 Ohio App. 213, 217 (4th Dist.1964) ("It is the province of the jury to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness.")

{¶ 15} Callender claims that three of the witnesses that the state relied on are not credible for various reasons. First, Callender argues the witness from the rival gang Squad, R.T.R., did not know Callender very well and that he heard other gunshots during the event. The second witness, L.R., who also heard other gunshots, lied under oath to protect the reputation of Coleman. The third witness, L.M., whom Callender characterizes as a classic jailhouse informant, was not to be believed when he testified that Callender admitted to being Coleman's killer. Callender argues that the veracity of these three witnesses is so lacking that there is a deficiency of sufficient evidence, and the convictions are not supported by a manifest weight of evidence.

{¶ 16} A jury as the trier of fact is in best position to judge the credibility of a witness. The weight to be given evidence and the credibility of witnesses are primarily jury issues. *State v. Ballew*, 76 Ohio St.3d 244, 249 (1996), citing *State v. Waddy*, 63 Ohio St.3d 424 (1992). As an appellate court, we must give deference to the fact finders because they are in the best position to observe the witnesses and their demeanor, gestures, and voice inflections and are entitled to believe or disbelieve any witness. *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 17} A jury may believe a witness even if there are reasons to doubt the witness. *See State v. Harris*, 73 Ohio App.3d 57, 63 (10th Dist.1991) (even though there was reason to doubt the credibility of the prosecution's chief witness, he was not so unbelievable as to render verdict against the manifest weight). The believability of such a witness's testimony is enhanced if there is some limited testimony from other witnesses. *Id.* at 67.

{¶ 18} The jury found these three witnesses credible. The three witnesses' stories do not contradict each other. We cannot say that the jury clearly lost its way or created a manifest miscarriage of justice in finding these witnesses credible.

### IV. The Law Proving Prior Calculation and Design

{¶ 19} The state must prove Callender caused the death of Coleman as a proximate result of committing or attempting to commit an offense of violence, felonious assault. R.C. 2903.02(B). The state must also prove prior calculation and design. R.C. 2903.01.

{¶ 20} Intent may be determined from the surrounding facts and circumstances. *State v. Johnson*, 56 Ohio St.2d 35, 38 (1978); *State v. Lott*, 51 Ohio St.3d 160, 168 (1990). Purpose and intent can be proven by circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147 (1988); *Jenks*, 61 Ohio St.3d 259. Moreover, purpose may be inferred where the natural and probable consequences of the wrongful act produces death. *State v. Robinson,* 161 Ohio St. 213 (1954); *State v. Fugate*, 36 Ohio App.2d 131 (2d Dist.1973). Intent may be inferred from the surrounding circumstances, including the instrument used to produce death and the manner of death. *Robinson*; *Fugate* at 132. A jury may presume an intention to kill where the natural and probable consequence of an act is to produce death, and the jury may conclude from the surrounding circumstances that there was an intention to kill. *Robinson* at 219-20.

{¶ 21} While "prior calculation and design" requires something more than instantaneous deliberation, it does not require a drawn-out thought process. *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph two of the syllabus. The Supreme Court of Ohio also listed factors to consider:

> [T]he court of appeals found three factors important in determining whether prior calculation and design exists: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events?"

*State v. Taylor*, 78 Ohio St.3d 15, 19 (1991), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist.1976). A timespan as short as two or three minutes can be sufficient, neither the degree of care nor the length or time the offender takes to ponder the crime beforehand are critical factors in themselves, but momentary deliberation is insufficient. *Taylor* at 22, quoting Committee Comment to Am.Sub.H.B. No. 511; R.C. 2903.01.

{¶ 22} There are numerous pieces of testimony and evidence of prior calculation and design to kill Squad members. The state proved the motive for the killing was based

on the dispute between the gangs PTSQ and Squad through multiple witnesses, as well as YouTube videos.

{¶ 23} Witness R.T.R., a minor and student of Linden-McKinley High School, who was a member of the gang Squad, the rival gang of Callender's gang, testified as to the shooting and to YouTube videos and Facebook posts.

{¶ 24} R.T.R. testified about a YouTube video titled "Fuck Monte," in which both Callender, Lil Mook, and Magic Mike appear. It is clear from the testimony and from the YouTube videos published before the killing that Callender stated in his rap that he was a "shooter," that Monte "should find him in the street," as well as "[y]ou don't want to fight me boy. I might end your life boy," and "bullets comin for you boy." (State's Exhibit M.) The evidence is clear of the animosity between the two gangs and threats made by Callender and very specifically in his YouTube videos, which where published under his street name J Dunk.

{¶ 25} R.T.R. testified that, on the day of the killing, Magic Mike approached Coleman and that, as a result of the conversation Monte was called and came to the location near McDonald's. (R. 133, Tr. Vol 1.) R.T.R. testified that he saw Lil Mook with a gun in his jacket pocket that was identified as the murder weapon. (R. 133, Tr. Vol. 1, 97.) R.T.R testified that, as Monte and Magic Mike approached each other to begin to fight, Callender, who was standing in front of Lil Mook, pulled out the gun and started firing at the crowd. R.T.R. stated Callender fired at him and Coleman who was standing right beside him. (R. 133, Tr. Vol. 1, 100-02.)

{¶ 26} Another witness, L.R., who was a student at Linden-McKinley High School and not a member of either gang, testified about the shooting and identified most of the people involved in the incident. L.R. testified that Coleman was in the gang Squad, and he identified three members of the gang PTSQ, including Callender. (R. 134, Tr. Vol. 2, 171-73.) L.R. testified about the events after school that day leading up to the fight and that he saw a member of PTSQ, Lil Mook, with a gun. (R. 134, Tr. Vol. 2, 173-78.) He testified that, while the fight was getting ready to start, another member of PTSQ exchanged something with Callender:

> A. I seen Lil Mook go in his pocket. I'm not gonna – he had
> the gun at the school, but I don't know for sure if it was a gun

he gave him when they was doing the little hand-off or whatever, but I seen them do like a little hand-off, like [Callender] had turned around a little bit and Mook had like handed him something.

Q. And before the hand-off you said he went into a pocket.  Is that the same pocket he had the gun in when you saw him?

A. Yeah, yeah.  So I assumed it was the gun still.

Q. But you saw him hand something to [Callender]?

A. Yes sir.

(R. 134, Tr. Vol. 2, 184.)   L.R., after identifying Callender, testified about the actual shooting itself, having stated that he had a clear view of the whole situation and saw Callender shoot toward Coleman four or five times.  L.R. also indicated in his testimony that he saw PTSQ member Magic Mike act like he was about to hit Squad member Monte but, instead, take a side-step that acted as a signal for Callender to start shooting:

A. That's when like Monte and Magic Mike started squaring up or whatever and then, like when Magic Mike went to swing, he like – he ain't going to swing.  He like side-stepped a little bit.  And I guess when he did like that little side-step or whatever, that was like the key to start shooting or something. I don't know, like it was their little code.  So that is when –

MR. BOYLE: Your Honor, I object.  That is all speculation.

MR. LOWE: It is based on what he saw, what he was interpreting.

THE COURT: Overruled.

Q. Go ahead.

A. So they was sitting there.  My – okay.  Magic Mike had his hoodie off or whatever and he started – Monte and them started squaring up.  Magic Mike act like he was about to hit him, but he side-stepped.  And before he side-stepped, like [Callender] was (unintelligible) around the house and then that is when I was – I was still in the alley, I could see

everything, and then that's when [Callender] had stepped out from the side of the house a little bit and that's when he just started shooting.

* * *

Q. You said you saw [Callender] shoot. How many times would you say you saw him shoot?

A. At least four or five times.

* * *

Q. When you saw [Callender] shoot, how – what direction was he shooting?

A. Towards the direction of the crowd that was in McDonald's.

Q. Is that toward where [Coleman] and Monte were?

A. Yeah, yes, sir.

(R. 134, Tr. Vol. 2, 185-87.)

{¶ 27} Callender challenged L.R.'s credibility at the trial, claiming he lied under oath to protect the reputation of the victim, Coleman. The lie occurred at a previous hearing when L.R. initially claimed that Coleman was not in a gang. L.R. admitted in that same hearing that he lied to protect Coleman's reputation. This issue was fully discussed in court, both the instance of the lie, the reasons for it, and then the admitting to it. The jury is the ultimate judge of credibility, and it is clear that this issue of credibility was fully presented to the jury.

{¶ 28} Witness L.M testified that, while incarcerated with Callender at the juvenile detention center, Callender talked to him about the killing. L.M. testified that Callender told him that, when the fight was about to start, he pulled out a gun and started shooting. L.M. testified that Callender said that he got the gun from "Mook" that day and that he saw that Callender had shot Coleman. L.M. also testified that Callender laughed about the killing, did not show any remorse, and acted like he had accomplished something.

{¶ 29} Applying the standards we are required to follow by the precedents from the Supreme Court of Ohio, the jury's verdicts were supported by sufficient evidence and were not against the manifest weight of the evidence.

{¶ 30} The first assignment of error is overruled.

## V. Evidence Admitted at Trial was Properly Authenticated

{¶ 31} The second assignment of error argues the trial court erred by permitting the state to introduce highly prejudicial evidence without establishing a proper foundation. The pieces of evidence in question are YouTube videos and Facebook posts that show hostility and threats made against the victim. Callender claims that the witness who viewed and testified about the videos stated he did not know Callender or other members of PTSQ very well and could not authenticate that it was PTSQ that made the video or the video's content.

{¶ 32} Evid.R. 901 states that all evidence must be properly authenticated before it is admissible into evidence. Exhibits are properly authenticated when there is evidence "sufficient to support finding that the matter in question is what the proponent claims." Evid.R. 901(A). Authenticity can be demonstrated by extrinsic evidence or the evidence can be self-authenticating. Authentication is satisfied when a proponent presents foundational evidence or testimony from which a rational jury may determine that the evidence is what its proponent claims it to be. *State v. Farrah*, 10th Dist. No. 01AP-968, 2002-Ohio-1918, ¶ 39. "The proponent need not offer conclusive evidence as a foundation must merely offer sufficient evidence to allow the question as to authenticity or genuineness to reach the jury." *State v. Caldwell*, 9th Dist. No. 14720 (Dec. 4, 1991).

{¶ 33} The trial court has broad discretion in the admission and exclusion of evidence and, unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, should not be reversed. *See State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 34} The evidence which is being contested on appeal are videos and pictures from social media in which members of Squad, including Coleman, were being threatened with death. The videos and pictures were posted on YouTube over a period of months and

continued up until four days before the shooting.  Callender is mistaken in his argument about the witness's ability to identify individuals in the videos.  While the witness was a member of the rival gang Squad and did not know the members of PTSQ well, he clearly identified members of PTSQ, including Callender, in the video.  The witness also testified that he had seen the PTSQ members before in person prior to the killing.  The YouTube videos were properly authenticated by the testimony of the witness pursuant to Evid.R. 901(B)(1).

{¶ 35} Evidence may also be authenticated by distinctive characteristics and the like; "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."  Evid.R. 901(B)(4).  The videos and pictures clearly demonstrate the hostility between PTSQ and Squad and provide strong support for the motive for Callender when he shot Coleman.  The clear content of the videos in particular make them authentic exhibits as to the hostility between the gangs and the threats of shooting members of Squad.

{¶ 36} The second assignment of error is overruled.

## VI. Conclusion

{¶ 37} Both assignments of error having been overruled, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.

_____