[Cite as *State v. McCarrel*, 2019-Ohio-2984.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 18AP-660 |
| | | (C.P.C. No. 16CR-5074) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Shatwan L. McCarrel, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on July 23, 2019

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee.

**On brief**: *Blaise G. Baker*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Shatwan L. McCarrel, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury verdict finding him guilty of unlawful sexual conduct with a minor and breaking and entering.

{¶ 2} On September 15, 2016, appellant was indicted on two counts of unlawful sexual conduct with a minor, in violation of R.C. 2907.04, and one count of breaking and entering, in violation of R.C. 2911.13. The indictment alleged the offenses occurred on September 4, 2016. The indictment further alleged appellant had previously been convicted of a violation of R.C. 2907.04, "to wit: December 19, 2012 in Franklin County Court of Common Pleas, * * * Unlawful Sexual Conduct with a Minor."

{¶ 3}   The matter came for trial before a jury beginning August 13, 2018.  The first witness for the state was C.P., age 15.  C.P., whose birthday is September 28, 2002, was 13 years of age during the events charged in the indictment.  C.P. resides primarily with her mother, but she sometimes stays with her father, L.P., who resides on South Wheatland Avenue.

{¶ 4}   In September 2016, C.P. was staying with her father.  C.P. has a friend, Mikayla, who lives nearby on Apple Street with her mother, sister, and brother.  Mikalyla's mother dated an individual who went by the nickname "Shy-Shy," and who C.P. identified at trial as appellant.  (Tr. Vol. I at 50.)  C.P. had informed appellant as to her age.

{¶ 5}   On two occasions, C.P. accompanied appellant to an abandoned house located next door to Mikayla's residence.  On the first occasion, C.P. went to the premises with Mikayla and appellant.  In order to gain entry, appellant broke a window on the first floor; once inside, appellant took a toilet seat from the bathroom of the residence.  Appellant took the item because "[t]he toilet seat was broken over at Mikayla's [house]."  (Tr. Vol. I at 51.)

{¶ 6}   Later that same day, C.P. went to the abandoned house with just appellant.  They entered through the broken window and went upstairs.  Appellant removed C.P.'s shorts and underwear.  C.P. and appellant had previously discussed "what we were going to do basically."  (Tr. Vol. I at 56.)  C.P. testified that appellant inserted his penis inside her vagina.  Appellant also placed his mouth and fingers inside her vagina.  C.P. and appellant then went back to Mikayla's house.  Later that evening, C.P. returned to her father's house; she did not tell her father what had happened.

{¶ 7}   C.P. testified she later posted messages to appellant on a private Facebook account and one of her messages to him included an inquiry whether he had used a condom, to which he responded no.  C.P. stated that appellant's Facebook name was "Shy-Loco."  (Tr. Vol. I at 61.)

{¶ 8}   At trial, plaintiff-appellee, the State of Ohio, introduced several exhibits containing screenshots of Facebook messages, and C.P. identified the exhibits as messages she exchanged with appellant.  Defense counsel objected to the introduction of

state's Exhibit No. A3, one of the Facebook screenshots.  The trial court overruled the objection.

{¶ 9}  C.P. testified she used her father's cell phone during the events because her phone had been stolen.  C.P.'s father later observed some of the Facebook messages.  As a result, C.P. was taken to a hospital and examined by a nurse.  C.P.'s father also contacted police officers.  The officers subsequently showed C.P. a photographic array; C.P. chose a photograph from the array, and she identified appellant at trial.

{¶ 10} L.P., the father of C.P., resides on South Wheatland Avenue.  L.P. testified he has a shared custody arrangement with C.P.'s mother, and C.P. was staying with him on Labor Day weekend, September 2016.  During that visit, L.P. became suspicious of C.P.'s behavior.  C.P. had used her father's cell phone, and L.P. observed messages on the phone from an app that had been left open.  Based on the messages he read, L.P. believed "somebody had sexual contact with my daughter."  (Tr. Vol. I at 108.)  L.P. was upset and went to the home of Mikayla's mother.  Appellant was not there at the time, but he arrived at the residence a short time later.

{¶ 11} L.P. confronted appellant with the phone messages and asked him "is that you and did you do this and he denied it.  He said that was somebody else."  (Tr. Vol. I at 110.)  L.P. testified that "[o]n the text it has his picture on there."  (Tr. Vol. I at 118.)  L.P. phoned the police, and subsequently took C.P. to the hospital.

{¶ 12} On September 5, 2016, Columbus Police Officer Jack Snyder was dispatched to South Wheatland Avenue following a report of a sexual assault.  Officer Snyder spoke with L.P. and advised L.P. to take C.P. to the hospital.

{¶ 13} On September 5, 2016, Amy Bock, a licensed clinical professional, conducted a forensic interview with C.P. at Nationwide Children's Hospital.  During the interview, C.P. told Bock she was at her friend Mikayla's house, where they were watching a movie.  C.P. later went outside and "Shy" also went outside and "asked her if she wanted to go to this old abandoned house that was next door."  C.P. stated they went to the second floor of the abandoned house "and he told her come here, pulled her closer to him and kissed her on the lips.  She then said that he pulled down her shorts and underwear, that he then pulled down his own pants and boxers and said they had sex."  C.P. "did clarify that by sex she said that Shy put his penis in her vagina.  She said it was painful

and that it went on a few seconds."  (Tr. Vol. II at 142.)  During the interview, C.P. disclosed "genital to genital contact."  (Tr. Vol. II at 145.)  C.P. also reported that Shy "licked her vagina and put his fingers inside of her vagina and squeezed her butt."  (Tr. Vol. II at 146.)  C.P. stated that "[h]e told her not to tell anyone because he didn't want to go to jail for having sex with an underage."  (Tr. Vol. II at 143.)

{¶ 14} Katherine Doughty, a licensed nurse practitioner at Nationwide Children's Hospital, performed a sexual-assault kit examination of C.P.  Doughty collected various swabs, including a vaginal swab and an oral swab.  During the examination, Doughty noted a bruise "at the 6:00 o'clock position" with respect to the "hymenal tissue or the tissue that surrounds the vaginal opening." Doughty also noted "between the 6:00 and 7:00 o'clock there was a shallow abrasion with some bleeding."  (Tr. Vol. II at 180.)  Doughty testified that "[t]hese injuries are diagnostic of penetrative trauma and it is consistent with the disclosures that [C.P.] has provided in her forensic interview of the alleged perpetrator's penis going into her vagina, and it is concerning for acute sexual assault." (Tr. Vol. II at 182.)  C.P. was 13 years of age at the time of the examination.

{¶ 15} On September 6, 2016, Columbus Police Detective James Shockey presented a photographic array of six individuals to C.P., and she identified the individual depicted in "position 4" of the array.  C.P. stated that "number 4 is Shy."  (Tr. Vol. II at 227.)

{¶ 16} On September 8, 2016, Detective Shockey accompanied another detective to the abandoned house on Apple Street.  At trial, the state introduced photographs taken by detectives at the location, including a picture of a toilet with a missing toilet seat.

{¶ 17} John Peigare, the property manager for Beacon Property Management and Realty, Inc. ("Beacon Property"), testified that Beacon Property managed the property of the abandoned house on Apple Street, Columbus, for Patriarch Investments.  In September 2016, the residence was vacant and boarded.  Peigare stated that appellant did not have permission or authorization to be on the property.  Peigare did not recall who the tenant was prior to September 2016.  He testified that a previous tenant "would not have been able to give anyone permission because the house was vacant and boarded."  (Tr. Vol. II at 211.)

{¶ 18} Scott Tennyson, a maintenance worker for Beacon Property, testified he was familiar with the abandoned property on Apple Street, Columbus. In September 2016, Tennyson observed that a board on a window of the residence had been removed. The window was located next to the back door. At trial, Tennyson identified a work order, dated September 7, 2016, to secure the premises.

{¶ 19} Lynndsey Simon, a forensic scientist with the Columbus Police Department, testified that test results from the vaginal swabs of C.P. confirmed male DNA from "at least two individuals," and that appellant "cannot be excluded as the contributor of the major component in this profile." (Tr. Vol. II at 250.) Simon further testified that "all paternity related male relatives of [appellant] cannot be excluded as the contributor as a major component of this male Y-STR profile." (Tr. Vol. II at 251-52.)

{¶ 20} At the close of the state's case-in-chief, appellant made a Crim.R. 29 motion for judgment of acquittal with respect to the charge of breaking and entering. The trial court denied the motion. At trial, the parties stipulated that appellant had been convicted of unlawful sexual conduct with a minor on December 19, 2012.

{¶ 21} By judgment entry filed August 28, 2018, the trial court sentenced appellant to 8 years each on Counts 1 and 2 (unlawful sexual conduct with a minor) and 12 months as to Count 3 (breaking and entering). The court ordered Counts 1 and 2 to be served consecutive to each other, but concurrently with Count 3.

{¶ 22} On appeal, appellant sets forth the following two assignments of error for this court's review:

> [I.] The trial court erred in overruling Defendant-Appellant's Motion for Judgment of Acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure.
>
> [II.] The trial court erred when it overruled Defendant-Appellant's objections and admitted testimony regarding the contents of written messages.

{¶ 23} Under his first assignment of error, appellant asserts the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal as to the charge of breaking and entering. According to appellant, the state failed to prove he lacked permission to enter the property at issue.

{¶ 24} A motion for judgment of acquittal under Crim.R. 29 "tests the sufficiency of the evidence," and therefore "an appellate court reviews a trial court's denial of a motion for acquittal using the same standard for reviewing a sufficiency of the evidence claim." *State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, ¶ 12. In reviewing a sufficiency of the evidence challenge, "[t]he relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt." *State v. Morock,* 10th Dist. No. 14AP-559, 2015-Ohio-3152, ¶ 9, citing *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38.

{¶ 25} R.C. 2911.13(A) defines the offense of breaking and entering, and states: "No person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony." Thus, the elements of breaking and entering under R.C. 2911.13(A) are "(1) the use of force, stealth, or deception, (2) to trespass in an unoccupied structure, (3) with purpose to commit a theft offense or felony inside." *State v. Payton,* 8th Dist. No. 76967 (Dec. 14, 2000).

{¶ 26} As noted, appellant contends the state failed to show he lacked permission to be on the premises. In support, appellant relies in part on the definition of stealth as taken from the Ohio Jury Instructions, which defines stealth to mean "any secret or sly act to avoid discovery and to gain entrance into or to remain within a structure of another without permission." Ohio Jury Instructions, CR Section 511.13(A) (Rev. 9-11-10). According to appellant, although the current property manager and a maintenance worker testified at trial, neither individual knew whether appellant had permission from the prior tenant to be on the property.

{¶ 27} In response, the state asserts appellant's argument is misplaced as it posits the existence of a hypothetical prior tenant who may have given appellant permission to enter. The state maintains that "being a *prior* tenant would not have given the hypothetical ex-tenant any ability to authorize the entry." (Emphasis sic.) (Appellee's Brief at 14-15.)

{¶ 28} Under Ohio law, "proof of guilt to sustain a breaking and entering conviction may be made by circumstantial evidence, real evidence, and direct evidence, or

any combination of the three." *State v. Williams*, 8th Dist. No. 98578, 2013-Ohio-1546, ¶ 10, citing *State v. Collins,* 8th Dist. No. 98350, 2013-Ohio-488*,* ¶ 15. In this respect, direct evidence of lack of permission is not required to sustain a conviction for breaking and entering. *See State v. Frost,* 2d Dist. No. 93-CA-19 (Mar. 9, 1994) (state not required to present testimony of owner of drive-thru to establish lack of permission as testimony of other individuals established they had entered drive-thru without permission).

{¶ 29} In the present case, the state presented evidence that the property at issue was abandoned and boarded up at the time of the events in question (i.e., September 2016). C.P. testified that appellant gained access to the property on Apple Street by breaking a window in the back of the house; once inside, appellant went to a bathroom and removed a toilet seat from the premises. A maintenance worker for Beacon Property (the property manager for the premises) observed an unsecured window at the location and placed a work order on September 7, 2016. The property manager testified he did not know appellant and appellant did not have permission from the owner to be on the premises.

{¶ 30} While appellant contends a prior tenant could have given consent, there was simply no evidence at trial suggesting appellant had ever been granted such permission. Further, we agree with the state that a prior tenant would have no prerogative currently in relation to the property. *See, e.g., State v. Ray,* 6th Dist. No. L-04-1273, 2005-Ohio-5886, ¶ 20 ("*past consent does not constitute current consent*"). (Emphasis sic.) More significantly, there was no evidence appellant had permission from the current owner to enter the premises on the date of the incident. As set forth above, the evidence indicated the house was abandoned and boarded shut, and appellant entered the residence by breaking a window. Here, the trier of fact could reasonably infer appellant lacked permission to enter the premises. *See, e.g., Williams* at ¶ 12 (forced entry suggestive of lack of permission to enter store). Accordingly, we reject appellant's contention that the state failed to present sufficient evidence to support the elements of breaking and entering.

{¶ 31} Appellant's first assignment of error is not well-taken and is overruled.

{¶ 32} Under his second assignment of error, appellant asserts the trial court erred in admitting, over objection, evidence regarding the contents of social media messages.

Appellant notes that defense counsel objected at trial to the admission of screenshots of alleged Facebook text messages between C.P. and appellant, asserting lack of foundation. Appellant further notes he did not testify at trial and never admitted sending text messages to C.P.

{¶ 33} The record indicates the state offered into evidence, during the direct examination of C.P., several exhibits containing screenshots of messages posted on a Facebook page. C.P. testified that the exhibits involved text messages she exchanged with appellant following the events in the abandoned house. Defense counsel objected to the state's introduction of Exhibit A3, a screenshot of the messages at issue, on the basis "[t]here is nothing to establish that was on my client's account - - Facebook account." (Tr. Vol. I at 63.) The trial court overruled the objection.

{¶ 34} In general, "the admission and exclusion of evidence is within the broad discretion of the trial court and will not be reversed absent an abuse of discretion and material prejudice." *State v. Jones,* 7th Dist. No. 00 JE 18, 2002-Ohio-2791, ¶ 21.

{¶ 35} Authentication of evidence is governed by Evid.R. 901(A). *State v. Howard,* 1st Dist. No. C-170453, 2018-Ohio-3692, ¶ 14. The requirement of authentication or identification "is a condition precedent to admissibility of evidence." *State v. Ollison,* 10th Dist. No. 16AP-95, 2016-Ohio-8269, ¶ 47. Pursuant to Evid.R. 901(A), this requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

{¶ 36} Evid.R. 901(B) sets forth "a list of illustrations that describe, without limiting, some ways in which evidence may be authenticated as required by Evid.R. 901(A)." *State v. Moorer*, 9th Dist. No. 27685, 2016-Ohio-7679, ¶ 8. Such methods include the testimony of a witness "with knowledge * * * that a matter is what it is claimed to be," Evid.R. 901(B)(1), as well as "[a]ppearance, contents, substance, internal patterns or other distinctive characteristics, taken in conjunction with circumstances," Evid.R. 901(B)(4).

{¶ 37} Under Ohio law, "[t]he threshold for authentication is low: ' "The proponent need not offer conclusive evidence as a foundation [but] must merely offer sufficient evidence to allow the question as to authenticity or genuineness to reach the jury." ' " *Ollison* at ¶ 47, quoting *State v. Callender*, 10th Dist. No. 15AP-15, 2015-Ohio-4255, ¶ 32,

quoting *State v. Caldwell,* 9th Dist. No. 14720 (Dec. 4, 1991). In this respect, "[c]ourts have interpreted Evid.R. 901(B)(1) 'to allow " 'any competent witness who has knowledge that a matter is what its proponent claims may testify to such pertinent facts, thereby establishing, in whole or in part, the foundation for identification.' " ' " *State v. Ross,* 10th Dist. No. 17AP-141, 2018-Ohio-3027, ¶ 37, quoting *State v. Gibson,* 6th Dist. No. L-13-1222, 2015-Ohio-1679, ¶ 49, quoting *Secy. of Veterans Affairs v. Leonhardt,* 3d Dist. No. 3-14-04, 2015-Ohio-931, ¶ 43, quoting *TPI Asset Mgt., LLC v. Conrad-Eiford,* 193 Ohio App.3d 38, 2011-Ohio-1405, ¶ 15 (2d Dist.). Further, " '[c]ircumstantial evidence, as well as direct, may be used to show authenticity.' " *Id.,* quoting *State v. Paster,* 8th Dist. No. 100458, 2014-Ohio-3231, ¶ 32.

{¶ 38} Ohio courts have held that "photographs of text messages can be admissible as an admission of a party-opponent under Evid.R. 801(D)(2)(a) if they are properly authenticated." *State v. Yeager,* 7th Dist. No. 18 JE 0008, 2019-Ohio-1095, ¶ 39. *See also State v. Davis,* 12th Dist. No. CA2015-05-015, 2016-Ohio-1166, ¶ 21 ("statements from text messages are properly authenticated and are admissible as a party-opponent admission when the recipient of the messages identifies the messages as coming from the defendant"); *State v. Inkton,* 8th Dist. No. 102706, 2016-Ohio-693, ¶ 93 (Facebook post, which was properly authenticated by testimony of detective and co-defendant, "was admissible under Evid.R. 801(D)(2) as an admission by a party-0pponent.").

{¶ 39} In a related vein, Ohio courts have addressed the issue as to the admissibility of evidence from social media content, including Facebook, under the authentication requirements of Evid.R. 901. *See*, *e.g.*, *State v. Caslin,* 10th Dist. No. 17AP-613, 2018-Ohio-5362, ¶ 20 (trial court did not err in admitting screenshot of Facebook page where witness "had knowledge the screenshot of the Facebook page was what it purported to be" and there was no evidence to support inference that screenshot photographs were contrived or altered); *Gibson* at ¶ 49 ("combination of both personal knowledge of the appearance and substance of the public Facebook profile pages, taken in conjunction with * * * direct and circumstantial evidence was sufficient to meet threshold admissibility requirement" of Evid.R. 901(B)(1)); *Ross* at ¶ 39-40 (testimony by witness that she was Facebook friends with defendant and that defendant responded to message posted by witness sufficient for purposes of authentication under Evid.R. 901).

{¶ 40} In the present case, C.P. testified the screenshots admitted at trial were private text messages she sent to appellant via Facebook. She also stated that appellant's Facebook name was "Shy-Loco." (Tr. Vol. I at 61.) C.P.'s father, L.P., testified he read the messages and observed appellant's "picture on there." (Tr. Vol. I at 118.) The content of the messages, including an inquiry by C.P. regarding the use of a condom and the corresponding response, contain information consistent with the events at issue. On review, we conclude the testimony of the witnesses, "taken in conjunction with" other direct and circumstantial evidence, was "sufficient to meet the threshold admissibility requirement" of Evid.R. 901. *Gibson* at ¶ 49. *See also Yeager* at ¶ 41-42 (trial court did not err in admitting Facebook messages where victim, one of the recipients of messages, testified they were transmitted by way of Facebook messenger account of defendant's girlfriend, and where content of message supported conclusion that message at issue was sent by defendant).

{¶ 41} Thus, the trial court did not abuse its discretion in admitting the exhibits at issue. Appellant's second assignment of error is not well-taken and is overruled.

{¶ 42} Based on the foregoing, appellant's two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

SADLER and DORRIAN, JJ., concur.

————————————