[Cite as *State v. Morgan*, 2021-Ohio-4443.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| HARLEY MORGAN | : | Case No. 2021 CA 00029 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:        Appeal from the Court of Common
                                Pleas, Case No. 20 CR 00503




JUDGMENT:                       Affirmed




DATE OF JUDGMENT:               December 17, 2021




APPEARANCES:

For Plaintiff-Appellee                  For Defendant-Appellant

PAULA M. SAWYERS                        APRIL F. CAMPBELL
20 S. Second Street                     46 1/2 N. Sandusy Street
Newark, OH  42055                       Delaware, OH  43015

*Wise, Earle, J.*

{¶ 1}   Defendant-Appellant Harley Morgan appeals the March 19, 2021 judgment of the Licking County Court of Common Pleas which sentenced him to an aggregate total of 31.5 years incarceration following convictions for attempted murder, three counts of aggravated burglary, three counts of felonious assault, and one count of menacing by stalking. Plaintiff-Appellee is the state of Ohio.

Facts and Procedural History

{¶ 2}   In March of 2020, Kenneth "Will" Wright committed suicide. Will was the father of H.K's 4 children. H.K. met Appellant Morgan, who was a friend of Wright's at Wright's funeral.

{¶ 3}   In June of 2020, Morgan contacted H.K. via Facebook messaging. In the message Morgan told H.K. he was very depressed over Wright's suicide and needed someone to talk to. The two became friends and then began a relationship in mid-August 2020.

{¶ 4}   The relationship quickly soured, however, when Morgan immediately displayed obsessive behavior with H.K. After approximately a week, H.K told Morgan she did not want to see him anymore.

{¶ 5}   Morgan did not take the news well and continued to call and text. When H.K. ignored Morgan he showed up at her apartment with an artificial rose. He told her his feelings for her would die when the rose died. Morgan's behavior frightened H.K.

{¶ 6}   On August 26, 2020, H.K. realized someone had been in her apartment. A basement window had been kicked in and she found a set of her keys in between the storm door and her front door. She further noticed her Facebook account had been

tampered with. While she had been at work that day she had received a message from Facebook alerting her to the fact that an unknown device had been used to log into her account. She noted all her male Facebook friends had been deleted and blocked. Further, messages had been sent through her account that H.K. had not sent herself. H.K. suspected Morgan because the search history on her account had not been cleared and contained a search for Morgan's ex-girlfriend which H.K. had not performed. H.K had never provided Morgan with her Facebook password.

{¶ 7}　H.K. messaged Morgan letting him know she knew he had been in her account. She told him his behavior was not acceptable and she did not want to hear from him again. Morgan responded by sending a message indicating he was going to harm himself. He told her not to blame herself. H.K. was aware Morgan had posted a fake news meme on his Facebook timeline with his photo and a headline stating "man commits suicide in park." H.K. knew Morgan had a gun because he had sent her a photo of the gun, and believed he would use it to harm himself.

{¶ 8}　For hours Morgan continued to send messages tending to indicate he was going to harm himself. H.K. already felt Wright's suicide was her fault and felt if Morgan killed himself that would be her fault as well. She finally told Morgan to stop as he had gone too far, and that she wanted to be left alone.

{¶ 9}　On September 2, 2020, H.K. came home to find her apartment had been broken into again. Maintenance again repaired the window and additionally installed a lock on the basement door at H.K.'s request.

{¶ 10} Following this break-in, H.K. was scared to stay at home and stayed elsewhere. In her minivan, at her sister's home, or her friend A.A.'s home.

{¶ 11}  A.A. was familiar with H.K.'s problems with Morgan as he had showed up uninvited at her home on August 13, 2020 while H.K. was there. On that occasion Morgan stood outside leaning on H.K.'s minivan until she finally came outside to talk to him. Around the same time, A.A. had also received suspicious messages from H.K.'s Facebook account. She and H.K. never communicated through Facebook and the messages came at 2:00 a.m. When A.A. asked H.K. about the messages she found H.K. had not sent them.

{¶ 12}  On September 15, 2020, H.K. had been at A.A.'s home along with her children, ages 7, 4, and 3-year-old twins, for most of the evening. When she was preparing to leave she noticed a smaller dark colored SUV parked a few houses down. The driver circled around parked again and then flipped the lights on and off. Both women were concerned. A.A. later texted H.K. a photo of the vehicle she had found on Facebook with Morgan in the driver's seat. The same vehicle would later be recorded on several security cameras in the area of H.K.'s apartment and in H.K.'s apartment complex.

{¶ 13} H.K. arrived home where she had not been since September 4. That night she put the children in her bed so they could watch a movie and she went to the basement to start laundry. She went back upstairs and fell asleep with the children before finishing the laundry, failing to lock the basement door.

{¶ 14} At approximately 4:45 a.m. H.K woke to a man standing over her with his hand over her mouth. The man wore a mask, but H.K recognized Morgan's eyes. H.K. saw her 7-year-old son B. sitting in front of her and heard Morgan say to B. "It's me, Justin, and nobody hurts Justin." Justin was an ex-boyfriend of H.K. Morgan then directed B. to

"find mommy's phone so we can call for help." H.K. next felt herself being dragged off the bed and being stabbed repeatedly.

{¶ 15} When Morgan paused his assault and turned his attention to H.K.'s children who were still sitting on the bed, H.K. ran downstairs and toward the front door of the apartment. Morgan caught her before she could get to the door and put the knife to her neck. H.K. grabbed the knife off her neck twice and ripped off Morgan's mask. She told Morgan to stop and added "Will wouldn't want you to do this." Morgan simply asked how H.K. knew it was him.

{¶ 16} H.K. continued to struggle and yell for help. B. showed up with a baseball bat and attempted to help his mother by striking Morgan with the bat. But Morgan grabbed the bat from B. and used it to strike H.K. in the face and head. Morgan then grabbed H.K.'s car and house keys and fled the scene.

{¶ 17} While that was happening, H.K.'s next-door neighbors Justin and Stephanie Smith heard about 10 minutes of banging and commotion before hearing H.K. yell for help. Justin ran out of his apartment in time to see Morgan fleeing. Justin gave chase for a short distance but Morgan got away. Justin returned to find Stephanie tending to H.K. who was lying on the floor of her living room covered in blood. When Stephanie asked H.K. who had done this, H.K. replied "Harley Morgan." The two stayed with her until help arrived.

{¶ 18} Newark Police and Paramedics arrived on the scene. H.K. was able to provide information as to who had attacked her and the weapons he used. She suffered multiple stab wounds all over her body and blunt force trauma to her head. She was transported to a Columbus trauma hospital.

{¶ 19} Morgan was later located at the home of a woman he had been seeing since September 2020. He had used her black Dodge Journey SUV to get to and from the crime scene. The clothing he was wearing was seized and later examined by the Bureau of Criminal investigation. Blood found on Morgan's pants belonged to H.K.

{¶ 20} The cell phones of both Morgan and H.K. were examined by Geoffrey Moran of the State Highway Patrol Criminal Intelligence Analysis Unit. Moran performed an extraction from each phone to create State's Exhibits 23 and 24, which were PowerPoint presentations of the information extracted from the phones. The information included Morgan's search history showing he sought information on GPS tracking and monitoring systems, his attempts to get into H.K.'s Facebook account, the photo of the gun he sent to H.K. and the website he used to create the fake news meme announcing his suicide. The extraction additionally included Morgan's conversations with others after he fled the crime scene and was looking for assistance in remaining undiscovered.

{¶ 21} The attack left H.K. critically injured and on life support. She suffered more than 20 stab wounds causing both lungs to collapse as well as bowel and other internal injuries. H.K. additionally suffered a concussion, broken ribs and numerous defensive wounds on her hands. Her pinky finger was nearly sliced off. Emergency surgery was required.

{¶ 22} As a result of these events, on September 23, 2020, the Licking County Grand Jury returned an eight-count indictment charging Morgan as follows:

{¶ 23} Count one, attempted murder in violation of R.C. 2923.02 and 2923.02(A), a felony of the first degree;

{¶ 24} Counts two and three, aggravated burglary in violation of R.C. 2911.11(A)(2), felonies of the first degree;

{¶ 25} Counts four and five, felonious assault in violation of R.C. 2903.11(A)(2), felonies of the second degree;

{¶ 26} Count six, menacing by stalking in violation of R.C. 2903.211(A)(1), a felony of the fourth degree;

{¶ 27} Count seven, aggravated burglary in violation of R.C. 2911.11(A)(2), a felony of the first degree; and

{¶ 28} Count eight, Felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree.

{¶ 29} Morgan pled not guilty to the charges and elected to proceed to a jury trial which began on March 9, 2021. On March 11, 2021, after hearing the above outlined evidence and deliberating, the jury found Morgan guilty as charged. He was subsequently sentenced to an aggregate total of 31.5 to 37 years incarceration.

{¶ 30} Morgan timely filed an appeal and the matter is now before this court for consideration. He raises four assignments of error as follow:

I

{¶ 31} "THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EXHIBIT 23 AND TESTIMONY CONCERNING THAT EXHIBIT OVER MORGAN'S OBJECTION, BECAUSE IT WAS INADMISSABLE, HARMING MORGAN AT HIS TRIAL"

II

{¶ 32} "THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING MORGAN'S FACEBOOK RECORDS BECAUSE IT WAS NOT ADMISSIBLE, AND HARMFUL TO ADMIT AT MORGAN'S TRIAL."

III

{¶ 33} "MORGAN WAS DENIED HIS RIGHT TO A FAIR TRIAL IN THIS CASE BECAUSE OF CUMULATIVE ERROR."

IV

{¶ 34} "THE TRIAL COURT ERRED IN FAILING TO MERGE MORGAN'S COUNTS 1-5 AND 7-8: MORGAN HAD ONE ANIMUS, AND ENGAGED IN ONE CONTINUING COURSE OF CRIMINAL CONDUCT, AND AGGRAVATED BURGLARY MERGES WITH THE PREDICATE OFFENSES."

I, II, III

{¶ 35} We address Morgan's first three assignments of error together. In these assignments of error Morgan argues the trial court abused its discretion by admitting state's exhibits 23, a power point presentation of the information obtained from H.K. and Morgan's cell phones, and state's exhibit 13, Morgan's Facebook account information. In the alternative, Morgan argues he was denied a fair trial due to cumulative error. We disagree.

Standard of Review

{¶ 36} "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake City*, 58 Ohio St.3d 269, 271 (1991). An appellate court must limit its review of the trial court's admission or exclusion

of evidence to whether the trial court abused its discretion. *Id.* The abuse of discretion standard is more than an error of judgment; it implies the court ruled arbitrarily, unreasonably, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). Generally, all relevant evidence is admissible. Evid.R. 402.

Power Point Presentation

{¶ 37} Appellant first argues admission of state's exhibit 23 and testimony regarding the exhibit was a violation of Evid.R 404(B). We disagree.

{¶ 38} Rule 404(B) of the Ohio Rules of Evidence and R.C. 2945.59 preclude admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶16. There are, however, exceptions to the rule. Evidence of other crimes, wrongs, or acts of an accused tending to show the plan with which an act is done may be admissible for other purposes, such as those listed in Evid.R. 404(B); to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 39}  In considering other acts evidence, trial courts should conduct a three-step analysis. The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. Second, the trial court must consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity with the character or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B), proof of motive, opportunity, intent, preparation, plan, knowledge, identity or

absence of mistake or accident. Finally, a trial court is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R. 403, *Williams*, at ¶¶19-20.

{¶ 40} "Because R.C. 2945.59 and Evid.R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom*, 40 Ohio St.3d 277, 281-82, 533 N.E.2d 682 (1988). As cautioned by the Ohio Supreme Court in *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), "... we therefore must be careful ... to recognize the distinction between evidence which shows that a defendant is the type of person who might commit a particular crime and evidence which shows that a defendant is the person who committed a particular crime." *Id.* at 530. Evidence to prove the character of person the defendant is to show he acted in conformity therewith is barred by Evid.R. 404(B).

### State's Exhibit 23

{¶ 41} Morgan first challenges the trial court's admission of the PowerPoint presentation of the cell phone extraction performed by Geoffrey Moran. Specifically, Appellant argues the photos of his hand with a gun in it, the fake news meme he created, and his web browser history showing he researched tracking and monitoring devices were not relevant to the charges. He additionally argues there was no propensity reason to introduce the evidence, that much of it was hearsay, and that it was unduly inflammatory and prejudicial.

{¶ 42} We start by noting Morgan was charged with menacing by stalking pursuant to R.C. 2903.211(A)(1). That section states:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

{¶ 43} Our examination of the record and the exhibits in question reveal Morgan terrorized and manipulated H.K. causing her mental distress and fear of harm in several ways. This included using the fact that the father of H.K.'s children had committed suicide to his advantage. After Morgan posted the fake news meme about his own death on Facebook he asked H.K. " Can I see you one more time? Please?" When she refused Morgan replied "Don't blame yourself for this." T. 153. Further, contrary to Morgan's assertion that he never sent the photo of the gun to H.K., H.K. was aware Morgan had the means to take his own life because he had indeed previously sent her the photo of

the firearm. T. 153-154 Morgan made H.K. believe he would harm himself because H.K. chose to end their relationship. T. 154. We therefore find both the photo of Morgan's hand holding a gun and the fake news meme about Morgan taking his own life were relevant to the charge of menacing by stalking by causing H.K. emotional distress and were presented for the legitimate purposes of proving motive and intent, and not unduly prejudicial. Accordingly, the trial court committed no abuse of discretion in admitting the same.

{¶ 44} Morgan additionally argues the emails, texts, and web-search history obtained through the extraction performed on his phone and contained in state's exhibit 23 were not relevant and contained hearsay within hearsay.

{¶ 45} The emails and web-search history slides contained in the exhibit pertained to Morgan's own searches for tracking/monitoring devices as well as services to monitor someone's phone. These slides were relevant to the menacing by stalking charge demonstrating Morgan engaged in a pattern of conduct designed to stalk, harass, and cause H.K. to believe Morgan would cause her physical harm and mental distress. Text messages contained in the exhibit pertained to both Morgan's consideration of how to handle H.K's decision to end their relationship and attempts to remain undiscovered following his attack on her. The former were relevant to prove Morgan's plan to exact revenge for H.K.'s act of rejecting him and the latter were evidence of flight after he did so. It is well established that evidence of flight is admissible, as it tends to show consciousness of guilt. *Sibron v. New York*, 392 U.S. 40, 66, 88 S.Ct. 1889, 20 L.Ed.2d 917(1967).

{¶ 46} As for the exhibit containing hearsay, we note Evid.R. 801(D)(2)(a) provides that "[a] statement is not hearsay if * * * [t]he statement is offered against a party and is (a) the party's own statement." The exhibit contained Morgan's own statements and results of his own searches.

{¶ 47} We conclude the trial court did not abuse its discretion in admitting State's Exhibit 23.

Facebook Account Information

{¶ 48} Appellant next argues his Facebook records, contained in exhibit 13, were admitted in error because they were not authenticated. We disagree.

{¶ 49} Evid.R. 901 governs authentication of evidence. Evid.R. 901(A) provides "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(B)(1) provides the authentication requirement can be satisfied through the "[t]estimony of [a] witness with knowledge" that "a matter is what it is claimed to be."

{¶ 50} In *State v. Callender*, 10th Dist. No. 15AP-15, 2015-Ohio-4255 at ¶ 32 the Tenth District Court of Appeals addressed the foundation required for admissibility of Facebook posts:

> Evid.R. 901 states that all evidence must be properly authenticated before it is admissible into evidence. Exhibits are properly authenticated when there is evidence "sufficient to support finding that the matter in question is what the proponent claims." Evid.R.

901(A). Authenticity can be demonstrated by extrinsic evidence or the evidence can be self-authenticating. Authentication is satisfied when a proponent presents foundational evidence or testimony from which a rational jury may determine that the evidence is what its proponent claims it to be. *State v. Farrah*, 10th Dist. No. 01AP-968, 2002-Ohio-1918, ¶ 39. "The proponent need not offer conclusive evidence as a foundation must merely offer sufficient evidence to allow the question as to authenticity or genuineness to reach the jury." *State v. Caldwell*, 9th Dist. No. 14720, 1991 Ohio App. LEXIS 5879 (Dec. 4, 1991).

{¶ 51} In this matter, Newark Police Department Detective Timothy Fleming testified he submitted a preservation request to Facebook for the Facebook accounts of both H.K. and Appellant. He additionally secured a search warrant for both accounts. T. 610-611, 613. Detective Fleming further testified the records he received from Facebook contained a verified phone number associated with Appellant, his known email, user name, and references to the instant offenses. T. 615-620.

{¶ 52} Appellant offered no challenge to this foundational evidence and testimony. We find this information and the testimony regarding the information was sufficient to support a finding that the records were indeed what the state alleged them to be. We therefore overrule Appellant's complaints as to state's exhibit 13.

Cumulative Error

{¶ 53} Appellant's third assignment of error alleges Appellant was denied a fair trial due to cumulative error as set forth in his first two assignments of error.

{¶ 54} In *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, the Supreme Court of Ohio recognized the doctrine of cumulative error. However, where we have found the trial court did not err, cumulative error is inapplicable. *State v. Carter*, 5th Dist. Stark No. 2002CA00125, 2003-Ohio-1313 at ¶ 37.

{¶ 55} In the instant matter, we have found no error in the admission of state's exhibits 13 and 23. The doctrine of cumulative error is therefore inapplicable.

{¶ 56} The first three assignments of error are overruled.

IV

{¶ 57} In his final assignment of error, Appellant argues the trial court erred by failing to merge counts 1 through 5 and 7 and 8. Appellant argues these offenses were committed with a singular animus and were one continuing course of conduct requiring merger. We disagree.

{¶ 58} R.C. 2941.25 governs multiple counts and states the following:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a

separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 59} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, syllabus, the Supreme Court of Ohio held the following:

1. In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import.

2. Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

3. Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus.

{¶ 60} The Ruff court explained at ¶ 26:

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

{¶ 61} In the matter at hand, both parties filed sentencing memorandums addressing the issue of merger. Morgan argued, as he does here on appeal, that because the offenses arose from one continuous attack, all of the felonious assault convictions should merge with the attempted murder and all the aggravated burglaries should merge with the felonious assault convictions.

{¶ 62} The state's sentencing memorandum argued Morgan's convictions for felonious assault as contained in counts four and five of the indictment which involved use of the knife and caused serious physical harm merged with count

one, attempted murder. The state further argued felonious assault as contained in count eight of the indictment and involving the use of the bat did not merge with any other offense as it resulted in harm separate from that inflicted by the knife. Finally, the state argued aggravated burglary as contained in counts two, three, and seven merged with each other as they were the result of one continuous trespass, but did not merge with any other conviction as the crime of aggravated burglary was completed the moment Morgan entered H.K.'s home.

{¶ 63} The trial court agreed with the state and found attempted murder as contained in count one and the felonious assaults as contained in counts four and five involving the knife merged. The state elected to proceed on count one, attempted murder. Transcript of sentencing (TS) at 9-10. The court further agreed that the aggravated burglaries contained in counts two, three, and seven merged and the state elected to proceed on count two. TS at 10.

{¶ 64} We also agree. The bat and the knife each caused separate, identifiable harm and therefore count eight, felonious assault involving the bat, did not merge with any other offense.

{¶ 65} Moreover, while the aggravated burglary counts contained in counts two, three, and seven merge with each other, they do not merge with any other count. Morgan committed the crime of aggravated burglary when he entered H.K's home through the basement widow with the intent to commit a crime. T. 289. See *State v. Lewis* 5th Dist. No. 15-CA-106, 2016-Ohio-7002 ¶ 28; *State v. Huhn* 5th Dist. No. 15-CA-0006, 2015-Ohio-4929 ¶ 21-22.

{¶ 66} We conclude the trial court did not err in failing to merge counts one through five and counts seven and eight. The final assignment of error is overruled.

{¶ 67} The judgment of conviction and sentence of the Licking County Court of Common Pleas is affirmed.

By Wise, Earle, J.

Baldwin, P.J. and

Hoffman, J. concur.

EEW/rw